UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **MARTIN J. WALSH**, Secretary of Labor, United States Department of Labor, <br><br>Plaintiff,<br><br>v.<br><br>**DAYEMI ORGANIZATION, INC. d/b/a LONGBRANCH CAFÉ AND BAKERY**, an Illinois corporation, and **ELAINE RAMSEYER GREENBERG**, an individual, <br><br>Defendants. | Civil action no.: 3:21-cv-00056-SMY<br><br>CJRA Track: B<br><br>Presumptive Trial Month: March 2022<br><br>Judge Staci M. Yandle |

## DECLARATION OF LINDSEY CORONA

I, **LINDSEY CORONA**, upon personal knowledge, do hereby state:

1. From August 2008 to the present, I have been employed by the U.S. Department of Labor, Wage and Hour Division ("WHD") as an Investigator in the St. Louis District Office located at 1222 Spruce Street, St. Louis, Missouri 63103.

2. As a WHD Investigator, I have received special training on conducting investigations into compliance with the statutes enforced by WHD, including the Fair Labor Standards Act, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA"). I have been involved in more than 241 FLSA investigations during employment with WHD. I have been the lead investigator on more than 162 of those investigations and have collected more than $775,000 in back wages for employees. I have also served as Agricultural Team Leader for the St. Louis District Office intermittently since at least 2013. I also helped train one investigator up to his completion of Basic I training, which takes around 6 to 12 months to complete.

3. I hold a Bachelor of Art degree in Spanish. I am a native English speaker and am fluent

in speaking, reading, and writing Spanish.

4. During the course of my official duties in February 2020, I was assigned to conduct investigations of Dayemi Organization, Inc. d/b/a Longbranch Café and Bakery ("Longbranch"). The initial investigation was opened February 3, 2020, and covered Longbranch Café, located at 100 E. Jackson St. in Carbondale, Illinois (the "Café"), for the period of February 6, 2018, through February 5, 2020 ("Investigation Period"). The Café is a full-service restaurant serving baked goods, coffee, and vegetarian/vegan fare.

5. Shortly thereafter, on February 12, 2020, WHD opened a concurrent investigation of Longbranch Bakery, located at 218 N. Illinois Street in Carbondale, Illinois (the "Bakery"), covering the period of June 9, 2019, through February 5, 2020. The Bakery prepared baked goods for the Café and offers catering for weddings.

6. The purpose of these investigations was to determine Longbranch's compliance with the FLSA.

7. I initiated the investigation of Longbranch on February 5, 2021, by conducting an unannounced visit to the Café and holding an on-site initial conference at Longbranch's office located above the Café. Longbranch's internal Finance Manager, Kim Veras, and an external consultant for management, Carolyn (Latifa) Deane, attended the initial conference on behalf of Longbranch. I provided a paper copy of my appointment letter in person at the outset visit in person and provided a copy of the letter by email. My on-site visit to Longbranch occurred over the course of February 5 and 6, 2020.

8. During the initial conference:

    a. Veras stated the Café and Bakery employs around 25 to 27 people per pay period, and employees are paid biweekly by check.

b. Veras stated that Defendant Elaine Ramseyer Greenberg is the General Manager at the Café and is responsible for its day-to-day operations, including hiring, firing, and supervising employees, assigning work, and directing management employees. Both Defendant Ramseyer and Veras had the authority to sign paychecks.

c. Veras stated that Dayemi Organization, Inc., is the legal name of the corporation operating Longbranch Café & Bakery. Veras also stated Dayemi Organization, Inc. is owned by a trust called Baraka Trust.

d. Veras provided materials showing Longbranch's annual sales as follows: $826,338 for 2017; $809,303 for 2018; and $766,884 for 2019. Longbranch also furnished 2017 and 2018 tax returns for the entire Dayemi Organization, which reflect $915,934 for 2017 and $849,470 for 2018. Veras also stated Longbranch's employees process credit card transactions transmitted outside the State of Illinois.

e. Veras stated the Café operated a tip pool, in which servers and baristas tipped out cooks and dishwashers.

f. I requested to review payroll records for a pay period in which employees would have worked overtime. Veras showed me a sample payroll document from the Café's busy season, which stated servers and baristas who worked more than 40 hours per workweek were paid at a rate of one-and-one-half-times their hourly tipped cash wage.

g. When I asked whether the tips earned by servers and baristas combined with their hourly cash wage equated to the federal minimum wage of $7.25/hour or higher,

Exhibit 1

    Veras stated that the Café did not keep a record of how much tips each employee received.

9. Following the initial conference, on or about February 5, 2020, Veras sent me an email reflecting information about Baraka Trust, which owns Dayemi Organization, Inc. According to the information Veras provided, Defendant Ramseyer is a board member for the Baraka Trust and her spouse, Din Muhammad Abdullah al-Dayemi, is the President of Baraka Trust.

10. During my tour of the Café on February 5 and 6, 2020, I witnessed the tip jars used for the Café's tip pool. The Café's Barista Manager, Wilbur Davis, explained how the Café's servers and baristas put all their tips from each shift into a tip jar for that shift. I saw that the tip jars were labeled with the names of the employees on each shift who were to receive a portion of the tips that included dishwashers and cooks.

11. During the course of the investigation, I conducted in-person and telephonic interviews of eight current and former non-management employees of the Café. Many of the non-management employees I interviewed stated that Defendants required servers and baristas to give all their tips into the tip pool and to give cooks and dishwashers a set percentage of the tip pool money; the other few employees did not know or did not question whether the tip pool was required. No employees believed the tip pool was voluntary. Three employees also reported servers and baristas told management at the Café that they did not want to share tips with the dishwashers and/or cooks, which fell on deaf ears.

12. I also interviewed Davis, the barista manager, on site at the Café during the course of my investigation. A true and accurate copy of Davis's interview statement is attached hereto as Exhibit 2.

13. During my visit to the Café, on or around February 5 or 6, 2020, Veras provided me paper copies of sample time records for a few biweekly pay periods. A true and accurate copy the sample time records are attached hereto as Exhibit 3.

14. On or about February 6, 2021, Veras provided me via email Year-to-Date ("YTD") Payroll totals. A true and correct copy of the YTD Payroll is attached hereto as Exhibit 4.

15. The YTD Payroll records and sample time records show:

    a. Servers and baristas were paid an hourly cash rate of $5 or $5.50 for their regular hours.

    b. The following five servers and baristas worked more than 40 hours in some workweeks of the Investigation Period in 2018 and 2019: Jamie Babre; Curtis Battrell; Lana Frutoz; Cierra Goolsby; and Jacob Gorecki.

    c. The servers and baristas who worked overtime during the investigation period were paid an overtime premium rate of 1.5 times their hourly cash wage (e.g. $7.50/hour overtime rate for server paid $5/hour cash rate).

    d. Davis, the Barista Manager, worked more than 40 hours in several workweeks during the period of January 1, 2020, through February 5, 2020.

    e. Davis was paid a salary of $471.15 per week during the entire investigation period, including during weeks when he worked more than 40 hours.

16. During the course of the investigation of the Bakery, Veras provided me payroll materials from Quickbooks. During my on-site visit to the Bakery on February 6, 2020, I saw time cards employees of the Bakery were using to record their daily and weekly hours for the current pay period, and asked to be provided the time cards for the Investigation Period. Veras told me that the time cards were thrown away after she was given information from

the time cards to input in Quickbooks every two weeks.

17. As a result of the investigation, WHD determined:

  a. Defendant Longbranch is a covered enterprise under § 3(s) of the Act. The yearly sales printout provided during the initial conference Longbranch shows Longbranch clearly had the requisite annual dollar volume of sales ("ADV") for 2018 and 2019. The Investigation Period ended during the first quarter of 2020. The ADV was met for the first quarter of 2020 because the ADV for the previous four quarters was above $500,000.

  b. Defendant Ramseyer is an employer under § 3(d) of the Act because she is a trustee for the trust that owns Dayemi Organization, Inc. and manages the day-to-day operations of the Café as its General Manager.

  c. Defendants operated an invalid tip pool that required servers and baristas to give a portion of their tips to non-tipped cooks and dishwashers. Because operation of this invalid tip pool precludes Defendants from taking a tip credit, they were found to have violated § 6 of the Act by paying servers and baristas less than the federal minimum wage.

  d. Defendants paid servers and baristas less than one-and-one-half times their legal regular rate for hours worked over 40 per workweek in violations of § 7.

  e. Defendants violated § 7 by failing to pay Davis an overtime premium rate of one-and-one-half times his regular rate for hours worked over 40 during 2020, when Davis's salary was not high enough to exempt him from the Act's requirements.

  f. Defendants violated the Act's recordkeeping requirements by failing to make records reflecting the appropriate regular rate and overtime premium rate for

servers and baristas, failing to document the amount of tips received by each employee of the Café, and failing to retain the Bakery time cards for two years.

18. I calculated Defendants owe $49,362.24 in unpaid minimum wage and overtime compensation to the 32 employees listed in Exhibit A to the Secretary's Complaint [ECF No. 1, PageID#8]. I followed WHD procedures in calculating back wages.

   a. I calculated Defendants owe $49,200.23 to 32 servers and baristas for unpaid minimum wage compensation as a result of the invalid tip pool using the YTD Payroll records provided by Defendants. Those records show the number of hours worked by each server and barista for the Investigation Period and the hourly cash wage paid to each. To compute how much servers and baristas would have received had they been paid the full federal minimum wage as required, each employee's tipped hours were multiplied by the difference between the direct wage (i.e. $5.00/hour) and the federal minimum wage ($7.25/hour). These computations were completed using the year-to-date tipped hours. The formula used is as follows: Tipped Hours x ($7.25 - $5.00) = Minimum Wage Compensation Due.

   b. I calculated Defendants owe $126.01 to five servers and baristas for unpaid overtime compensation using the YTD Payroll records provided by Defendants. Those records show the amount of overtime hours worked by each server and barista during the investigation period and the rate paid by Defendants for those overtime hours. Because Defendants paid servers and baristas based on their hourly cash wage rather than the lawful minimum wage, I computed back wages by first multiplying the state minimum wage by 1.5 to arrive at time and a half

7

rate. Then the state tip credit was subtracted to arrive at a time and a half hourly wage. Then the rate paid was subtracted from the time and a half rate to arrive at the amount the employer was deficient per hour. This hourly deficiency was multiplied by the overtime hours worked per tipped employee. The formula used is as follows: IL MW $8.25 x 1.5 = $12.38 - $3.25 (state tip credit) = $9.13 - $7.50 (ER Paid) = $1.63 hourly deficiency. $1.63 x Tipped OT Hours Worked.

   c. I calculated Defendants owe $38.42 to Davis for unpaid overtime compensation resulting from Defendants misclassifying him as FLSA exempt in 2020. To calculate this amount, I used Defendants' YTD Payroll records and sample biweekly time records, which showed Davis's weekly salary and the number of overtime hours he worked during the several weeks of 2020. Davis's back wages were calculated by dividing his weekly salary by his weekly hours resulting in his regular rate. His regular rate was halved and multiplied by the overtime hours he worked resulting in the overtime back wages owed to him.

19. My calculations of unpaid minimum wage and overtime compensation, discussed above, are summarized in the Form WH-56 and Form WH-55. True and accurate copies of the Form WH-56 and Form WH-55 are submitted herewith as Exhibit 5.

20. A final conference was held on March 6, 2020, in which Defendants were represented by Deane, Veras, and Defendant Ramseyer. I represented WHD at the final conference. I explained and presented WHD material, i.e. Fact Sheets, regarding the minimum wage, overtime, recordkeeping and child labor violations. Defendants indicated an understanding of compliance and agreed to future compliance regarding tip pooling and overtime requirements. With regard to the tip pool, Defendants were informed of WHD's

finding the tip pool was mandatory, which was not denied by Defendant Ramseyer.

21. To date, Defendants have not paid any back wages to Café employees for unpaid minimum wage and overtime compensation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Date:        November 22, 2021

Signed:        _____*Lindsey Corona*_____
              **LINDSEY CORONA**