**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| **MARTIN J. WALSH**, Secretary of Labor, United States Department of Labor,                             *Plaintiff*,     v.    **DAYEMI ORGANIZATION, INC. d/b/a LONGBRANCH CAFÉ AND BAKERY**, an Illinois corporation, and **ELAINE RAMSEYER GREENBERG**, an individual,                            *Defendants*. | Civil action no.: 3:21-cv-00056-SMY<br><br>CJRA Track: B<br><br>Presumptive Trial Month: March 2022<br><br>Judge Staci M. Yandle |

**SECRETARY OF LABOR'S MEMORANDUM IN SUPPORT OF**
**HIS MOTION FOR SUMMARY JUDGMENT**

Plaintiff Martin J. Walsh, Secretary of Labor, U.S. Department of Labor ("Secretary") submits this memorandum in support of his *Motion for Summary Judgment* against Defendants Dayemi Organization, Inc. d/b/a Longbranch Café and Bakery and Elaine Ramseyer Greenberg (collectively, "Defendants"). The Secretary seeks to hold Defendants accountable to their employees for violating the Fair Labor Standards Act, as amended, 29 U.S.C. § 201 *et seq.* ("FLSA" or the "Act"), during the period of February 6, 2018, through February 5, 2020 ("Investigation Period"). As discussed below, the Secretary is entitled to summary judgment because the undisputed facts show Defendants improperly took a tip credit for tipped employees in violation of the Act's minimum wage provisions, paid tipped employees less than one-and-one-half times their regular rates for overtime work, and misclassified a manager as FLSA exempt in violation of the Act's overtime requirements. Furthermore, Defendants failed to make and keep appropriate pay and time records in violation of the Act's recordkeeping requirements.

**I. Issues Presented**

There are no genuine disputes of material fact and the Secretary is entitled to judgment as

a matter of law on the following issues:

    a.    Whether Defendant Longbranch Café & Bakery is an FLSA-covered enterprise for the investigation period including, in particular, the first 36 days of the year 2020;

    b.    Whether Defendant Ramseyer is an employer under the Act;

    c.    Whether Defendants violated § 6 of the Act by making it mandatory, rather than voluntary, for servers and baristas to pay into a tip pool, which included non-tipped employees such as cooks and dishwashers;

    d.    Whether Defendants violated § 7 of the Act when they paid less than the legal overtime premium rate to servers and baristas who worked more than 40 hours during some workweeks of the investigation period;

    e.    Whether Defendants violated § 7 of the Act when they misclassified a barista manager as FLSA exempt and consequently failed to pay them for overtime work;

    f.    Whether Defendants violated § 11 of the Act by failing to make and keep certain pay and time records;

    g.    Whether appropriate remedies for Defendants' FLSA violations include back wages, an equal amount of liquidated damages, and an injunction for future compliance.

## II. Statement of Undisputed Material Facts

    a.    <u>Longbranch Café & Bakery Operations</u>

Defendant Dayemi Organization, Inc., d/b/a Longbranch Café and Bakery ("Longbranch Café & Bakery" or "Longbranch"), is a corporation operating in Carbondale within Jackson County, Illinois. (Defs.' Am. Answer ¶ II.A., ECF No. 16, PageID#43.) It is composed of a full-service café/restaurant located at 100 E. Jackson St. (the "Café"), and an off-site bakery located 0.1 miles away from the Café at 218 N. Illinois St. (the "Bakery"). (*Id.*) Longbranch Café &

Bakery is owned by Dayemi Organization, Inc., which is owned by Baraka Trust. (WHI Corona Decl., Ex. 1 at ¶¶ 8c, 9.) Defendant Ramseyer is an officer of Dayemi Organization and a board member of Baraka Trust. (*Id.* ¶ 9.) Defendant Ramseyer's husband is President of the Trust. (*Id.*)

The Café serves baked goods, coffee, and vegetarian/vegan fare, and employs servers, baristas, cooks, and dishwashers, among others. (*Id.* ¶ 4.) The Bakery prepares baked goods for the Café, as well as offers catering for weddings. (*Id.* ¶ 5.) During the course of business at Longbranch, employees handled coffee and food products manufactured outside of Illinois, baked goods using ingredients and equipment from outside Illinois, and processed credit card transactions transmitted outside Illinois. (ECF No. 19, PageID#75.) Longbranch's gross annual dollar volume of sales for calendar years 2018 and 2019 exceeded $500,000. (*Id.* PageID#74.)

Defendant Ramseyer is the General Manager of the Café and has held this position for approximately 18 years. (Def. Ramseyer Dep. Tr., Ex. 11 at 16:11-21.) In this role, she is responsible for overseeing the general day-to-day operations of the Café, including supervising employees, and hiring and firing employees. (*Id.* 16:22-17:17.) Defendant Ramseyer also oversees operations of the Bakery, procures supplies, hires employees, and provides guidance regarding employee discipline. (*Id.* 16:22-17:2, 19:18-22:3.)

  b. The Café's Compensation Practices

During the Investigation Period, Defendants paid servers and baristas either $5 or $5.50 per hour, and took a tip credit for the remainder of their minimum wage obligation. (ECF No. 19, PageID#77-78.) Servers and baristas were not informed in advance of Defendants' use of a tip credit as part of their wages and were only notified of the tip credit when they saw it on their paychecks. (Ex. 11 at 41:7-20, 42:4-11.) During the Investigation Period, Defendants computed the overtime premium rate for servers and baristas, who worked more than 40 hours per

workweek, based on their hourly cash wage rate of $5 or $5.50. (ECF No. 19, PageID#78.)

Defendants employed a barista manager, Wilbur Davis, at the Café. (*Id.*) They paid Davis on a salary basis at $471.15 per workweek during the entire Investigation Period. (*Id.* PageID#79.) Davis worked more than 40 hours during several workweeks from January 1 through February 5, 2020. (Ex. 1 ¶ 15d; Ex. 3.)

Defendants paid the Café's cooks and dishwashers at the hourly state minimum wage or higher during the Investigation Period and did not take a tip credit for them. (Ex. 11 at 42:12-18, 43:10-16.) Defendants concede the Café's dishwashers and cooks had *de minimis* contact, if any, with customers. (ECF No. 19, PageID#77.) Dishwashers and cooks performed their work in the kitchen, which diners could not access, and did not receive tips from customers. (Ex. 11 at 42:19-43:21.) Cooks and dishwashers did not hold any other positions at the Café. (*Id.* 43:22-24.)

    c.   <u>The Café's Tip Pool</u>

During the Investigation Period, and for many years before, Defendants operated a tip pool in which servers and baristas placed all tips received during a shift into a tip jar. (*Id.* 46:21-48:14.) Money from the tip jar was distributed at the end of each shift to employees who worked that shift as follows: 90% divided between the servers and baristas, 5% to the cook(s), and 5% to the dishwasher. (*Id.* 51:24-52:2, 54:3-18.) Defendants admit they required the servers and baristas to contribute to the tip pool, determined the amount of tips to be contributed, and the tip amounts given to cooks and dishwashers. (ECF No. 19, PageID#77.)

Although they did not inform employees about the tip credit, Defendants made sure servers and baristas understood the tip pool rules and expectations from the very outset of their employment. (Ex. 11 at 58:13-59:13.) Defendant Ramseyer and other employees informed interviewees and newly hired servers and baristas about the tip pool, including how it operated

and amounts paid to cooks and dishwashers from the tip pool. (*Id.* 61:14-24.) Defendant Ramseyer told new hires the tip pool was part of "the practices we follow here" at the Café. (*Id.* 60:8-61:11.) Employees confirm they were trained that the tip pool was standard Café procedure. (Emp. 1 Decl., Ex. 6 ¶¶ 8, 9; Emp. 2 Decl., Ex. 8 ¶ 8; Emp. 3 Decl., Ex. 9 ¶¶ 9-10; Emp. 4 Decl., Ex. 10 ¶¶ 7-8.)[1] Defendant Ramseyer herself even acknowledges "new hires did come into a pre-existing climate where they might maybe have felt ordered" to tip out dishwashers and cooks. (Ex. 11 at 73:12-21.) Defendants never told to employees that tipping out dishwashers and cooks was voluntary or optional until the Department of Labor's investigation. (Ex. 8 ¶ 11; Ex. 9 ¶ 16; Ex. 10 ¶ 9.) To the contrary, Defendants promised cooks and dishwashers a set portion of the tips earned by servers and baristas. (Ex. 9 ¶¶ 9-10, 13; Ex. 10 ¶ 7.)

Defendants' tip policy was also contained in the Front of the House Standard Operating Procedures ("FOH SOP") during the investigation period. (Ex. 6 ¶ 7; Ex. 7.)[2] The policy explains how the tip pool operates, including instructions for how servers should pay cash and credit card tips into the tip jars and how the money from the tip pool should be distributed. (Ex. 7.) Notably, the FOH SOP tip pool policy states, "Tip out Kitchen, Dishwasher, Barback and Host 5% each." (*Id.*) Nothing in the tip pool policy contained in the FOH SOP indicates tipping out the cooks and dishwashers was an option or voluntary in nature.

Employees and managers of the Café confirmed Defendants' role in creating and enforcing the tip pool. (Davis Int. State., Ex. 2.) Servers, baristas, cooks, and dishwashers understood the tip pool to be mandatory. (Ex. 6 ¶ 9; Ex. 8 ¶ 10; Ex. 9 ¶ 15; Ex. 10 ¶ 9; *see also*

---

[1] Identifying information has been redacted from the declarations pursuant to the government informants privilege. *See Roviaro v. United States*, 353 U.S. 53, 59 (1957); *Hodgson v. Charles Martin Inspectors of Petroleum, Inc.*, 459 F.2d 303, 305–06 (5th Cir.1972). On request, the Secretary will provide unredacted copies to the Court for *in camera* review.
[2] Defendants acknowledge the FOH SOP tip policy submitted as Ex. 7 accurately reflects tip pool operations during the Investigation Period, except that the Café did not employ any bussers, bar backs, or hosts. (Ex. 11 at 85:1-86:22.)

Ex. 1 ¶ 11.) They had no control over whether to pay into the tip pool, what amount to contribute, or how the tip pool was distributed. (Ex. 8 ¶ 10; Ex. 9 ¶ 16; Ex. 10 ¶ 9.) The servers and baristas were unhappy about sharing their tips and complained about the practice amongst themselves. (Ex. 6 ¶¶ 10-11; Ex. 8 ¶¶ 9, 12-13; Ex. 9 ¶ 10; Ex. 10 ¶ 12; *see also* Ex. 1 ¶ 11.) Servers and baristas who deviated from the tip pool rules, inadvertently or otherwise, were swiftly corrected and made to comply. (Ex. 6 ¶ 11; Ex. 8 ¶¶ 12-13; Ex. 10 ¶ 11.) The servers and baristas who were brave enough to tell Defendant Ramseyer and other managers that they did not want to tip out the cooks and dishwashers were chastised, disciplined, or retaliated against. (Ex. 6 ¶ 11; Ex. 8 ¶ 9; *see also* Ex. 9 ¶ 13; Ex. 10 ¶ 14.)

Although Defendants claim no employees told them they did not want to contribute, their assertion is refuted by the statements of their employees. Moreover, Defendants admit that if a server or barista had told them they did not want to tip out, Defendants would have "entertain[ed]" that opinion and talked it over with the staff. (Ex. 11 at 72:9-20.) Defendants do not indicate a server or barista would have been allowed to keep their tips in that circumstance. Further, Defendants admit it would be a "problem" if they caught a server or barista keeping tips and suggested it would result in reprimand. (*Id.* 71:22-72:7.)

    d.  <u>Longbranch Café & Bakery's Recordkeeping Practices</u>

The Café's pay records for the Investigation Period reflect that Defendants paid servers and baristas a regular hourly cash wage of $5 or $5.50 and overtime at one-and-one-half times their hourly cash wage. (Ex. 1 ¶ 15c; Ex. 3; Ex. 4.) Defendants admit they did not document the amount of tips received by each employee of the Café. (ECF No. 19, PageID#78.)

At the Bakery, Defendants used time cards to record the hours worked each day and week by Bakery employees, but threw away the timecards after they were used to input the biweekly

payroll into Quickbooks. (Ex. 1 ¶ 16; Ex. 11 at 39:3-11.)

    e.  <u>Defendants' Lack of Good Faith Efforts to Determine FLSA Compliance.</u>

Defendants admit they knew "nothing" about the FLSA prior to the initiation of the Wage & Hour Division's ("WHD") investigation. (Ex. 11 at 91:1-21.) Defendants did not review WHD's guidance or website, or consult with any lawyer, financial advisor, or government official about whether their pay practices complied with the FLSA. (*Id.* 94:17-96:24.)

**III. Legal Standard**

Summary judgment is proper if the movant shows there is no genuine issue of material fact and they are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). No genuine issue of fact exists if "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 474 U.S. 574, 587 (1986).

**IV. Argument**

    a.  <u>Defendant Longbranch Café & Bakery is a covered enterprise under the Act.</u>

Defendant Longbranch Café & Bakery is an enterprise engaged in commerce or in the production of goods for commerce under FLSA § 3(s)t, 29 U.S.C. § 203(s). Under § 3(s), such an enterprise is defined as a business that has: (1) employees engaged in commerce, the production of goods for commerce, or working with goods or materials that have been moved in or produced for commerce, and; (2) an annual gross dollar volume of sales ("ADV") of $500,000 or more. 29 U.S.C. § 203(s)(1)(A). ADV is calculated either by the business's earnings during a tax year or, where there is doubt about whether a business has the requisite ADV for a particular period, the business's earnings during the twelve months preceding the beginning of a given fiscal year. 29 C.F.R. § 779.266; *Rivera v. Heights Landscaping, Inc.*, No. 03 C 6428, 2004 WL

7

434214, at *2 (N.D. Ill. 2004). The latter method, called the "rolling quarters" analysis, is used to determine whether a business, which once met the gross sales requirement in the previous year, continues to be covered in the following quarter year. *See Donovan v. I-20 Motels, Inc.*, 664 F.2d 957, 958 (5th Cir. 1981). Under the rolling quarters method, the ADV threshold is met for a particular quarter if the business's gross sales for the 12-month period immediately preceding that quarter total $500,000 or more. 29 C.F.R. § 779.266(b).

Defendants admitted their employees engaged in commerce and worked with goods moved in and produced for commerce. (*See* ECF No. 19, PageID#75.) Defendant Longbranch therefore meets the "commerce" requirement to be a covered enterprise.

Additionally, Defendant Longbranch had an ADV of more than $500,000 during the investigation period. Defendants admit Longbranch's ADV exceeded $500,000 in calendar years 2018 and 2019. (*See id.*, PageID#74.) With regard to 2020, only the first quarter of 2020 ("Q1 2020") is needed to establish enterprise coverage for the Investigation Period, which concluded February 5, 2020. (Ex. 1 ¶ 17a.) Even assuming for the purposes of this Motion that Longbranch's ADV for 2020 as a whole was less than $500,000, as Defendants claim, coverage for Q1 2020 is established under the rolling quarter analysis. The 12-month period immediate preceding Q1 2020 is composed of all four quarters of calendar year 2019. (*Id.*) It is unchallenged the gross sales for calendar year 2019 totaled more than $800,000. (*Id.* ¶ 8d; Ex. 11 at 26:8-12.) Because the gross sales for the 12 months immediately before Q1 2020 exceeded $500,000, Longbranch meets the ADV requirement for that quarter.

      b. <u>Defendant Ramseyer is an individual employer under the Act.</u>

Defendant Ramseyer is an individual employer within the meaning of FLSA. The FLSA defines "employer" to "include any person acting directly or indirectly in the interest of an

employer in relation to an employee." 29 U.S.C. § 203(d). Under the FLSA, two or more employers may jointly employ an individual. *Falk v. Brennan*, 414 U.S. 190, 195 (1973). As such, each employer is responsible, both individually and jointly, for compliance with the Act. 29 C.F.R. § 791.2. Individuals have been found liable where they served as corporate officers, had significant ownership interest in the company, and exerted control over the company's day-to-day functions, whether directly or indirectly. *Riordan v. Kempiners*, 831 F.2d 690, 694 (7th Cir. 1987); *Downs v. Gebco Mach., Inc.*, 873 F. Supp. 2d 1010, 1014 (S.D. Ill. 2012) (ruling supervisor could be employer under the FLSA where he owned and managed the business during plaintiff's employment, including hiring employees, dictating terms of work, and setting pay).

Defendant Ramseyer had an ownership interest in Longbranch as an officer of the trust that owns it and actively controlled its day-to-day functions as general manager of the Café, including by hiring, firing, and supervising employees, establishing pay practices, and overseeing daily operations. (Ex. 1 ¶ 9; Ex. 11 at 16:11-17:2, 19:18-22:3.) Defendant Ramseyer's ownership interest in and control over Longbranch shows she acted in the interest of Longbranch with regard to its employees. She is therefore an employer under the Act and is jointly liable with Defendant Longbranch for violations of the Act.

c. Defendants' tip pool violated the Act's minimum wage requirements.

The Secretary is entitled to a finding that Defendants violated the Act's minimum wage requirements because they paid servers and baristas less than minimum wage and were not entitled to take a tip credit due to their operation of an invalid tip pool. FLSA § 6 requires employers pay a federal minimum wage of at least $7.25 per hour. 29 U.S.C. § 206(a). However, § 3(m) permits an employer to take a tip credit toward its minimum wage obligation for tipped employees equal to the difference between the required cash wage (which must be at least $2.13)

9

and the federal minimum wage. 29 U.S.C. § 203(m). To use this credit, an employer must: (1) provide proper notice of the tip credit;³ and (2) allow the tipped employee to retain all tips unless there is a valid tip pool. *See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.54(c)(1)-(2); *Driver v. AppleIllinois, LLC*, 917 F. Supp. 2d 793, 795-96 (N.D. Ill. 2013).

A valid tip pool is one that includes only "employees who customarily and regularly receive tips." 29 U.S.C. § 203(m)(2)(A). Courts generally look to employees' duties and level of interaction with customers in determining whether they are a customarily and regularly tipped employees, and as such, do not consider cooks and dishwashers to be tipped employees. *Roussell v. Brinker Int'l, Inc.*, 441 Fed. Appx. 222, 231 (5th Cir. 2011) (emphasizing "direct customer interaction" differentiates tipped and non-tipped employees, and stating "[b]ack-of-the-house staff like cooks and dishwashers do not [receive tips], and thus cannot participate in a mandatory tip pool."); *Myers v. Copper Cellar Corp.*, 192 F.3d 546, 550 (6th Cir. 1999); Wage & Hour Div., U.S. Dep't of Labor, *Fact Sheet #15: Tipped Employees Under the FLSA* (Apr. 2018) ("A valid tip pool may not include employees who do not customarily and regularly receive tips, such as dishwashers [and] cooks . . . ."). If an employer requires tipped employees to participate in a tip pool that includes non-tipped employees, such as cooks and dishwashers, the tip pool is invalid. 29 U.S.C. § 203(m); *Berger v. Perry's Steakhouse of Ill., LLC*, 430 F. Supp. 3d 397, 404 (N.D. Ill. 2019). An employer who operates an invalid tip pool cannot take a tip credit and must instead pay its employees the full federal minimum wage. *Id.*

Tipped employees may voluntarily chose to share tips with non-tipped employees

---

³ Employers must provide oral or written notice to tipped employees in advance of using the tip credit. 29 U.S.C. § 203(m); 29 C.F.R. § 531.59(b). It is undisputed that the only way severs and baristas would have known of Defendants' use of a tip credit is if they deduced that information from their paychecks. (*See* Ex. 11 at 41:7-20, 42:4-11.) Defendants' failure to provide notice of the tip credit until after it was taken is another reason Defendants are not eligible to take a tip credit for servers and baristas. *See* 29 U.S.C. § 203(m); 29 C.F.R. § 531.59(b); *Bruske v. Capitol Watertown Sprechers, LLC*, No. 2021 WL 3737449, at *4 (W.D. Wisc. Aug. 24, 2021) ("If an employer does not provide this information in advance of its use of the tip credit, it is not eligible to take the credit.").

without running afoul of the FLSA, provided their choice to share tips is "free from any coercion whatsoever and outside any formalized arrangement or as a condition of employment." *Roussell*, 441 Fed. Appx. at 230. For example, in *Turner v. Millennium Park Joint Venture, LLC*, the U.S. District Court for the Northern District of Illinois found permissible a tip pool arrangement in which servers paid $3 per day to silverware rollers based on an implied voluntary agreement of the servers. 767 F. Supp. 2d 951 (N.D. Ill. 2011). The employer in *Turner* held several meetings with servers during a discrete time period to discuss how to improve operations, during which servers unanimously voted for hiring silverware rollers to perform certain "set up functions" then being performed by the servers and gave management a standing ovation when it agreed to do so. *Id.* at 952-53. The court found the servers had implicitly agreed to tip out the silverware rollers, rendering the tip arrangement permissible. *Id.* at 955. In so ruling, the court relied on the facts that the servers urged management to hire silverware rollers, continued to accept the tip arrangement voluntarily over several years, and benefitted from the arrangement by no longer having to perform the tasks now done by the silverware rollers. *Id.*

      Whereas in the instant case, Defendants undisputedly operated a mandatory tip pool in which servers and baristas paid a portion of their tips to dishwashers and cooks, and the unchallenged facts and well-established law demonstrate the Café's cooks and dishwashers are not tipped employees,[4] Defendants tip pool is invalid if it was mandated by Defendants. The mandatory nature of the tip pool is demonstrated by the uncontroverted evidence showing Defendants required the servers and baristas to contribute, set the amounts received by cooks and dishwashers, and ensured the tip pool rules were followed. Defendants admit they required tip

---

[4] Defendants admit the Café's cooks and dishwashers had minimal contact with customers, if any, never received tips from customers and performed all work in the kitchen away from customers. (*See* ECF No. 19, PageID#77; Ex. 11 at 42:19-43:21.) Their lack of customer interaction and the nature of their duties make clear the cooks and dishwashers should not be considered customarily and regularly tipped employees. *Myers,* 192 F.3d at 550.

11

pool participation and set the tip out amounts. (*See* ECF No. 19, PageID#77.) They ensured servers and baristas knew the tip pool rules from the outset of their employment and characterized those rules as company procedure or policy, including its tip pool policy in the FOH SOP materials. (*See* Ex. 11 at 60:8-61:11; Ex. 7.) Given Defendants' characterization of the tip pool as standard procedure, it is unsurprising employees believed servers and baristas were required to adhere to the rules and believed they would get in trouble with management for refusing to do so. (*See* Ex. 6; Ex. 8; Ex. 9; Ex. 10.) The mandatory nature of the tip pool is also evident from the repercussions suffered by employees who attempted not to participate, which included retaliation. (*See* Ex. 8 ¶ 9.)

Defendants themselves admit servers and baristas may have "felt ordered" to participate given their messaging about the tip pool. (Ex. 11 at 73:12-21.) Moreover, they acknowledge servers and baristas could not simply opt out of tipping out the cooks and dishwashers; any opposition by servers or baristas would have led to a larger conversation, at best, or a "problem," at worst, but not guaranteed change. (*Id.* 71:22-72:20.) Thus, by Defendants' own admissions, servers and baristas could not change the tip pool rules without management approval.

Despite this evidence, Defendants contend the tip pool was voluntary because it arose from Defendants' conversations with servers and baristas over the course of 15+ years regarding whether and how to distribute their tips. (*See id.* 44:18-45:2.) Although evidence from Longbranch's own management refutes this contention (*see* Ex. 2), even assuming *arguendo* it were true, the circumstances presented here are distinguishable from those in which tipped employees' ongoing voluntary arrangement renders a tip pool permissible, such as in *Turner*. As an initial matter, the *Turner* plaintiffs did not provide evidence, like that presented here, showing employees felt forced to participate in the tip pool. *See Turner*, 767 F. Supp. 2d at 954. Further,

the employer in *Turner* presented evidence detailing specific meetings in which servers unanimously voiced a desire to hire silverware rollers, while Defendants here present only vague assertions that the tip pool arrangement was discussed "occasionally" at staff meetings over the past 15+ years but provide no evidence of when those meetings occurred, what was said, or who attended. (*See* Ex. 11 at 62:1-64:2.) Moreover, unlike in *Turner*, where servers unanimously voted to hire the silverware rollers to improve their jobs, the Café's servers and baristas had no role in hiring of cooks and dishwashers and did not want to tip them out. Relatedly, the *Turner* court emphasized the silverware rollers performed work that otherwise would be done by the servers, allowing the servers to best serve customers and earn additional tips, and <u>expressly distinguished dishwashers and cooks on this basis</u>. *See Turner*, 767 F. Supp. 2d at 954-55. Consistent with the court's recognition in *Turner*, the work of the Café's servers and baristas did not include washing dishes or preparing food. Thus, unlike in *Turner*, an ongoing voluntary tip arrangement cannot be implied from Defendants' vague assertions that the servers and baristas consented to the tip pool during the 15+ years it was in place.

  Defendants also make much of the fact that allegedly no servers or baristas informed them they did not wish to participate in the tip pool. Defendants' allegation is squarely refuted by employees. (*See* Ex. 6 ¶¶ 10-11; Ex. 8 ¶ 9.) However, even if it were true that employees had not complained of the tip pool to management, the mere lack of complaints does not render the tip pool voluntary given that Defendants presented the tip pool as mandatory and employees felt ordered to participate, believing they'd be chastised by management for complaining. Moreover, Defendants acknowledge servers and baristas would not have had the authority to change the policy without management's consideration and approval. (Ex. 11 at 71:22-72:20.)

  Thus, even construing the evidence in the light most favorable to Defendants, a

reasonable trier of fact could not find Defendants' tip pool was voluntary. Because Defendants operated a mandatory tip pool, in which servers and baristas were forced to give a portion of their tips to non-tipped employees, the Café's tip pool was invalid. Because they operated an invalid tip pool, Defendants cannot avail themselves of a tip credit and must instead pay servers and baristas the full federal minimum wage.

      d.  <u>Defendants violated the Act's overtime provisions.</u>

Defendants failed to pay tipped employees and a barista manager at the appropriate overtime rate for hours worked over 40 hours per week. FLSA § 7 sets a maximum workweek of 40 hours and requires employers to pay non-exempt employees one-and-one-half times their regular rates for hours worked in excess of 40 hours in a workweek. 29 U.S.C. § 207(a)(1).

      1.  *Defendants failed to pay servers at the appropriate overtime rate.*

Under applicable law, servers at the Café who worked more than 40 hours were entitled to an overtime rate of one-and-one-half their regular rate. The regular rate of pay for a tipped employees, such as servers, includes both the cash wage and the amount of tip credit taken by the employer per hour. 29 C.F.R. § 531.60; *see also Pizzella v. Diner*, No. 18-4663, 2021 WL 1649517, at *5 (E.D. Penn. Apr. 27, 2021) ("Where an employer takes a tip credit, overtime is calculated based on the full minimum wage . . . not on the lower direct (or cash) wage payment."). An employee's regular rate for the purpose of computing overtime pay must be *at least* equal to the $7.25 minimum wage under § 6 of the Act. 29 C.F.R. § 778.107. Moreover, in states like Illinois where the legal minimum wage exceeds $7.25/hour, the regular rate cannot be lower than the state minimum wage, as "regular rate" as used in § 7 of the Act is "construed to mean the regular rate at which he is lawfully employed." 29 C.F.R. § 778.5.

Here, for the purpose of computing overtime pay, the regular rate for the Café's servers

must be at least the Illinois state minimum wage of $8.25,[5] and must include both the cash wage paid by Defendants and the tip credit taken by Defendants to meet their minimum wage obligation. Defendants undisputedly calculated servers' overtime pay based only on their cash wages of $5.00 or $5.50 per hour, which resulted in an overtime premium rate far lower than that to which the servers were legally entitled. (*See* ECF No. 19, PageID#78.) Because Defendants' did not pay servers at one-and-one-half times their lawful regular rate for hours worked over 40 per workweek, Defendants violated the Act's overtime requirements.

> 2. *Defendants Misclassified a Barista Manager as Exempt from the Act's Overtime Requirements.*

Defendants failed to pay a barista manager, Wilbur Davis, at one-and-one-half times his regular rate for hours worked in excess of 40 per workweek because they improperly classified him as FLSA exempt. As relevant here, § 13 exempts from overtime requirements "any employee employed in a bona fide executive . . . capacity." 29 U.S.C. § 213(a)(1). To qualify, an employee must be paid above a certain salary threshold. 29 C.F.R. §§ 541.100(a), 541.600(a). As of January 1, 2020, the salary threshold is $684 per workweek. *Id.* Thus, Defendants cannot avail themselves of the executive exemption for Davis for the period of January 1 through February 5, 2020, because Defendants undisputedly paid Davis a weekly salary of $471.15. (*See* ECF No. 19, PageID#79.) Defendants do not put forth any other applicable exemption. It is also undisputed that Davis worked more than 40 hours during several weeks of 2020. (Ex. 1 ¶ 15d; Ex. 3.) The undisputed evidence therefore establishes Davis was not exempt from the Act's overtime requirements during 2020, but Defendants failed to pay him at one-and-one-half his regular rate when he worked more than 40 hours in a workweek.

    e. <u>Defendants violated the Act's recordkeeping provisions.</u>

---

[5] 820 Ill. Comp. Stat. 105/4.

Defendants did not keep and maintain accurate records regarding employee compensation or retain records concerning employee hours for the requisite time period. FLSA § 11 requires employers to "make, keep, and preserve such records of the persons employed by [them] and of the wages, hours, and other conditions and practices of employment maintained by [them]. . . ." 29 U.S.C. § 211. Records must state, among other items, an employee's regular hourly rate; hours worked each workday and each workweek; the total daily or weekly straight-time earnings or wages due; and the total premium pay. 29 C.F.R. § 516.2(a)(6)-(9). For tipped employees specifically, employers are also required to keep and maintain records of the weekly or monthly amount of tips employees receive and report to the employer and the amount by which wages increased by tips. 29 C.F.R. § 516.28. Payroll records must be maintained for three years and time records, including time cards, for two years. 29 C.F.R. §§ 516.5, 516.6.

The Café's pay records, on their face, show Defendants did not make and keep records showing the correct regular rate and overtime rate for servers and baristas. (*See* Ex. 3; Ex. 4.) As discussed above, Defendants failed to pay servers and baristas the federal minimum wage, given their loss of entitlement to the tip credit due to the invalid tip pool, and appropriate overtime rate. Because Defendants' pay records reflect an improper hourly regular rate and overtime rate, Defendants did not make and maintain accurate records of servers' and baristas' regularly hourly rate and premium pay amounts in violation of FLSA § 11 and 29 C.F.R. § 516.2(a)(6)-(9).

Further, Defendants admit they did not make or keep records for the Café reflecting the amount of tips each employee earned. (ECF No. 19, PageID#78.) Therefore, Defendants' own admission shows they violated § 11 of the Act and 29 C.F.R. § 516.28(a)(2) by failing to make and keep records showing the weekly or monthly amount of tips received by each employee.

At the Bakery, Defendants had time cards recording the hours worked each day and week

by Bakery employees, but threw away the timecards after two weeks once payroll was inputted. (Ex. 1 ¶ 16; Ex. 11 at 39:3-11.) Because Defendants did not retain the Bakery time cards for the requisite two years, they violated § 11 of the Act and 29 C.F.R. § 516.6(a)(1).

    f.   The Secretary's sought-after remedies are appropriate.

        1.  *WHD properly computed Defendants' back wage liability.*

Defendants' admissions and records show WHD properly calculated back wages resulting from Defendants' minimum wage and overtime violations. WHD computed a total of $49,362.24 in back wages owed to 32 employees. (Ex. 1 ¶ 18; Forms WH-55 & WH-56, Ex. 5.)

Because Defendants lost their entitlement to a tip credit due to the invalid tip pool, they owe their servers and baristas the full federal minimum wage of $7.25. *See* Part IV.c, *supra*. WHD properly computed back wages by calculating the difference between $7.25/hour tipped employees were owed and the $5 or $5.50/hour they were paid, as shown in Defendants' payroll records. WHD then multiplied that amount by each employee's hours worked. (Ex. 1 ¶ 18a.)

Defendants also owe servers and baristas who worked more than 40 hours per week an overtime premium rate of one-and-one-half times their legal regular rate of pay. *See* Part IV.d.1, *supra*. Because Defendants admittedly paid overtime based servers' and baristas' cash wage of $5 or $5.50/hour, rather than one-and-one-half times the Illinois minimum wage of $8.25/hour, WHD properly calculated the amount of unpaid overtime compensation by multiplying $8.25 by 1.5 and then subtracting the $3.25 state tip credit amount and amounts already paid by Defendants, to arrive at the deficient amount per hour. (*Id.* ¶ 18b.) WHD then multiplied the hourly deficiency by the number of overtime hours worked for each server or barista. (*Id.*)

Finally, Defendants owe Davis for unpaid overtime compensation because they misclassified him as FLSA-exempt in 2020. *See* Part IV.d.2, *supra*. WHD properly calculated

17

back wages owed to Davis by dividing his weekly salary by his weekly hours, as shown in Defendants' pay records, to arrive at a regular rate. (*Id.* ¶ 18c.) WHD then calculated the amount of additional pay he was owed for overtime by dividing his regular rate by 2 and multiplying the overtime hours he worked from January 1, through February 5, 2020. (*Id.*)

        2. *Defendants are liable for liquidated damages.*

The FLSA provides that employers who violate the Act's minimum wage and overtime provisions "shall be liable" for liquidated damages equal to the amount of unpaid compensation. 29 U.S.C. § 216(b). Liquidated damages are "mandatory [for FLSA violations] unless the district court finds that the defendant-employer was acting in good faith and reasonably believed that its conduct was consistent with the law." *Shea v. Galaxie Lumber & Constr. Co., Ltd.*, 152 F.3d 729, 733 (7th Cir. 1998). The employer bears the substantial burden to prove good faith and reasonableness. *Bankston v. Illinois*, 60 F.3d 1249, 1254 (7th Cir. 1995). To show good faith, an employer must take affirmative steps to ensure its FLSA compliance; it may not simply claim ignorance. *Walton v. United Consumers Club*, 786 F.2d 303, 312 (7th Cir. 1986); *Remelius v. Vaisala Inc.*, No. 15-cv-0553, 2016 WL 5847043, at *2 (S.D. Ill. Oct. 6, 2016) ("A reasonable man wouldn't see good faith merely because an employer was ignorant of a problem.").

In this case, even viewing the evidence in the light most favorable to Defendants, no reasonable fact finder could find Defendants acted with the requisite good faith. It is undisputed Defendants knew "nothing" about the FLSA and took no affirmative steps to ascertain whether their tip pool or overtime practices were compliant, such as seeking advice of a legal or financial adviser or consulting government resources. (*See* Ex. 11 at 91:1-21, 94:17-96:24.) Even taking as true Defendants' claim they believed their practices were compliant based on Defendant Ramseyer's experience and alleged lack of complaints by employees or the bookkeeper, their

passive assumption of the legality of the tip pool and overtime practices amounts to mere ignorance of the law. *See Remelius*, 2016 WL 5847043, at *2 (rejecting defendant's argument that it acted in good faith because employee never complained about FLSA violation). Because Defendants made no inquiry into whether their practices were FLSA compliant, Defendants cannot meet their burden of establishing good faith. *See Bankston*, 60 F.3d at 1255 ("The defendants failed to show how they took steps to be more certain of plaintiffs' status [under the FLSA]. The lack of such an inquiry indicates a lack of good faith in complying with the responsibilities imposed by the FLSA."). Accordingly, the Court should impose liquidated damages in an amount equal to back wages.

        3.   *An injunction is appropriate.*

District courts are empowered to enjoin violations of the Act. 29 U.S.C. § 217. An injunction is necessary if there are insufficient assurances of an employer's future compliance. *See, e.g.*, *Brock v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987); *Perez v. Super Maid, LLC*, 55 F. Supp. 3d 1065, 1080 (N.D. Ill. 2014). Because injunctions are remedial, courts grant them even when violations have ceased unless the court "soundly is convinced from the situation that there is no reasonable probability of a recurrence of the acts." *McComb v. Wyandotte Furniture Co.*, 169 F.2d 766, 770 (8th Cir. 1948). In determining whether to issue an injunction, courts "must give 'substantial weight to the fact that the Secretary seeks to vindicate a public, and not a private right.'" *Martin v. Funtime Inc.*, 963 F.2d 110, 113 (6th Cir. 1992) (quoting *Brock v. Big Bear Market No. 3*, 825 F.2d 1381, 1383 (9th Cir. 1987)). Imposition of an injunction is "essential" and is not punitive because it imposes duties already required by the Act. *Id.* at 114.

An injunction to ensure Defendants comply with the Act in the future is appropriate here given the importance to the public of the rights assured by the FLSA and the lack of reliable

19

assurances that Defendants will not violate these rights in the future. Although Defendants assert they have changed their tip pool practices, they have not presented sufficient assurances of future compliance so as to avoid an injunction. To date, Defendants have not paid any back wages owed to the Café's employees as a result of their minimum wage and overtime. (*See* Ex. 1 ¶ 21.) Accordingly, any assurances of future compliance by Defendants are not reliable.

## V. Conclusion

Based on the foregoing, there is no genuine dispute as to any material fact relied on by the Secretary, and the Secretary, as a matter of law, is entitled to summary judgment finding Defendants violated the Act's minimum wage, overtime, and recordkeeping requirements, are liable for unpaid compensation totaling $49,362.24 and an equal amount of liquidated damages, and are enjoined and restrained from violating the FLSA in the future.

Respectfully submitted,

**SEEMA NANDA**
Solicitor of Labor

**CHRISTINE Z. HERI**
Regional Solicitor

**ELISABETH NOLTE**
U.S. Department of Labor
Office of the Solicitor
230 South Dearborn Street, Rm. 844
Chicago, Illinois 60604
312-353-7837
Nolte.Elisabeth.P@dol.gov
IL Bar No. 63221218

*Attorneys for Plaintiff Martin J. Walsh, Secretary of Labor, United States Department of Labor*