1          IN THE UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF ILLINOIS

3  MARTIN J. WALSH,            )
   Secretary of Labor,        )
4  United States Department    )
   of Labor,                   )
5              Plaintiff,      )
     vs.                       ) No. 2021 CV 56
6  DAYEMI ORGANIZATION,        )
   INC., d/b/a LONGBRANCH     )
7  CAFE AND BAKERY, an         )
   Illinois Corporation,      )
8  and ELAINE RAMSEYER         )
   GREENBERG, an               )
9  individual,                 )
               Defendants.     )

10

11        The discovery deposition of

12  ELAINE RAMSEYER GREENBERG, taken in the

13  above-entitled cause, before Trisha A. Rankin, a

14  Certified Shorthand Reporter in the State of

15  Illinois, on September 30th, 2021, at the hour

16  of 9:00 a.m., via videoconference, pursuant to

17  notice.

18

19

20

21

22

23  Reported by:  Trisha A. Rankin, CSR

24  CSR License No.:  084.004833



```
 1    APPEARANCES:

 2       OFFICE OF THE SOLICITOR

 3       US DEPARTMENT OF LABOR, by

 4       MS. ELISABETH SIMCOX NOLTE,

 5       230 South Dearborn Street

 6       Room 844

 7       Chicago, Illinois 60604

 8       (312) 353-7837

 9       nolte.elisabeth.p@dol.gov

10            Representing the Plaintiff;

11

12       RHODE LAW FIRM, by

13       MS. SHARI R. RHODE,

14       1405 West Main Street

15       Carbondale, Illinois 62901

16       (618) 549-4287

17       shari@rhodelawfirm.com

18            Representing the Defendants.

19

20

21

22

23

24
```



Exhibit 1 Elaine Ramseyer Greenberg 09/30/2021

```
 1                    I N D E X

 2   WITNESS                          EXAMINATION

 3   ELAINE RAMSEYER GREENBERG

 4     By Ms. Nolte                            4

 5     By Ms. Rhode                          135

 6

 7

 8                  E X H I B I T S

 9   NUMBER                          IDENTIFICATION

10   ELAINE RAMSEYER GREENBERG Deposition

11     Exhibit 1                              7

12     Exhibit 2                              7

13     Exhibit 3                             26

14     Exhibit 4                             29

15     Exhibit 5                             82

16     Exhibit 6                            111

17     Exhibit 7                            115

18     Exhibit 8                            123

19

20

21

22

23

24
```

1      THE REPORTER:  Parties are present via

2  videoconference to take the discovery deposition

3  of Elaine Ramseyer.  The deposition is being

4  taken by means of videoconferencing and the oath

5  will be administered remotely by the court

6  reporter pursuant to Governor Pritzker's

7  executive order 2020-14.

8           Will all parties present please state

9  your name and agreement with the procedure?

10      MS. NOLTE:  Good morning.  This is

11  Elisabeth Nolte for the Secretary of Labor.  And

12  I am in agreement with the procedure.

13      MS. RHODE:  And I'm Shari Rhode.  I'm here

14  for the defendants.  And I agree to the

15  procedures.

16      THE WITNESS:  And I'm Elaine Ramseyer

17  Greenberg.  I'm the defendant.

18           ELAINE RAMSEYER GREENBERG,

19  having been first duly sworn, was examined and

20  testified as follows:

21                   EXAMINATION

22  BY MS. NOLTE:

23      Q.   Good morning, again.  My name is

24  Elisabeth Nolte.  I'm an attorney for the

1     A.   Thirty minutes.

2     Q.   And did you speak with anyone other

3  than your attorney to prepare for today?

4     A.   No.

5     Q.   Okay.  So my next series of questions

6  relates to Longbranch Cafe located at 100 East

7  Jackson Street in Carbondale, Illinois.

8  Ms. Ramseyer, how long have you worked at the

9  Cafe?

10     A.   Twenty-three years.

11     Q.   And what is your position title at the

12  Cafe?

13     A.   I'm currently the general manager.

14     Q.   How long have you had that position?

15     A.   That's a good question.  I started as a

16  baker and got pushed into management.  It's a

17  bit of a you blur.  But I'm guessing eighteen

18  years.

19     Q.   So eighteen years in your current

20  position, management position?

21     A.   That sounds about right.

22     Q.   And could you please describe for me

23  your duties as general manager.

24     A.   I oversee the general day-to-day

1   operations.  The -- the -- what's happening in

2   the kitchen.  What's happening in the bakery.

3   What's happening on the floor.

4           I make sure the place gets opened on

5   time.  That things are -- customers are being

6   taken care of.  That the ordering and receiving

7   is happening.  It's typical of certain GM stuff

8   on a small scale, small town scale.  A lot of

9   moving parts.

10      Q.   I can imagine.  So it sounds like you

11  -- do you supervise employees at the Cafe?

12      A.   I do.

13      Q.   And can you hire employees for the

14  Cafe?

15      A.   Yes.

16      Q.   How about fire employees for the Cafe?

17      A.   Of course.

18      Q.   And about how many days per week do you

19  work at the Cafe?

20      A.   Five.

21      Q.   I know you had mentioned baker before,

22  before you held this position.  Had there been

23  any other positions besides baker or general

24  manager that you have held at the Cafe?

```
 1        A.   I believe I'm secretary treasurer.

 2        Q.   Okay.  Thank you.  Just turning now to

 3   a few basic questions about Longbranch Bakery

 4   located at 218 North Illinois Street in

 5   Carbondale.  Have you ever worked at the Bakery,

 6   Ms. Ramseyer?

 7        A.   I have.

 8        Q.   And when was that?

 9        A.   I did an apprenticeship in Germany.

10   And I came back and worked at the bakery for

11   about a month, training people in making German

12   bread.  That would have been about five years

13   ago.

14        Q.   And other than this month about five

15   years ago, have you been involved in the

16   operations of the Bakery at any time?

17        A.   No, I have not worked at the Bakery.

18        Q.   So you don't supervise employees at the

19   Bakery?

20        A.   No.  Not directly, no.

21        Q.   Could you explain the relationship that

22   you have with employees at the Bakery, please.

23        A.   The Bakery is about a block away from

24   the Cafe.  It's bumped into the commissary to
```

1    the Cafe.  The Bakery has its own staff of

2    bakers and a bakery manager.  I interface with

3    those people every day because they're

4    delivering fresh baked goods.

5           Obviously when we throw the doors open

6    we have to have things fresh and in the case.

7    So I see these people every day on a working

8    basis.  I also meet -- meet with the bakery

9    manager.  Functions like that.

10       Q.   When you say that you interface with

11   employees of the bakery every day, could you

12   describe what that looks like in a little bit

13   more detail.

14       A.   As they're -- I see them in the Cafe as

15   they're coming in, bringing the baked goods.

16   I'm helping them load the two pastry cases.

17   We're discussing kind of on the fly, something

18   that happens in restaurants.  Seasonal things.

19   You know, hey, Halloween is coming, got any

20   ideas, et cetera.  Just the normal banter around

21   the day-to-day operations.

22          They let me know if they are running

23   low on things, and could I pop out and get an

24   ingredient.  Or is it okay to, you know, buy



Exhibit 14

```
 1   something extra.  You know, or maybe there's a
 2   special cake that's going to be delivered and I
 3   need to know that someone is picking it up at
 4   2:00.
 5          It's just the day-to-day operations of
 6   interfacing and bringing things over.  It's, you
 7   know, kind of a direct contact.
 8       Q.   Thank you for that explanation.  I
 9   appreciate it.  So do you have any authority to
10   hire employees at the Bakery?
11       A.   I do.  As the general manager and as
12   the person working with the bakery manager, of
13   course, I do.  Yes.
14       Q.   And would you discipline or fire
15   employees at the Bakery?
16       A.   Well, that's done through the bakery
17   manager, but I certainly have input to that and
18   provide guidance.  And I guess if I put my foot
19   down one way or the other it would go my way.
20       Q.   Okay.  Would you say that over the past
21   two years you've been at least familiar with all
22   of the employees in the Bakery?
23       A.   Yes.
24       Q.   And do you have any role with regards
```



1   to like setting pay practices at the Bakery?

2       A.   Yes, raises are certainly -- I have to

3   approve raises, yes.

4       Q.   And about how frequently would you say

5   you enter the Bakery space, the facility?

6       A.   How often do I enter the physical

7   space?

8       Q.   Yes.

9       A.   Several times a week.  At least two or

10  three times a week.

11      Q.   Okay.  Thank you.

12      A.   Uh-huh.

13      Q.   Turning back to operations more

14  generally, did Longbranch Cafe close for a

15  portion of 2020?

16      A.   Yes.  We closed due to the Coronavirus.

17      Q.   And do you happen to know what date

18  that you had initially closed on?

19      A.   Yes.  I believe we closed on

20  March 15th.

21      Q.   Of 2020, correct?

22      A.   Correct.

23      Q.   And do you recall what date the Cafe

24  re-opened?



```
1        A.   Yes.

2        Q.   Okay.  Thank you.  What sorts of

3   documents would those be, if you know?

4        A.   Well, we -- I have a bookkeeper.  We

5   track everything.  So I just simply have to ask

6   her and she can give me the numbers.  I mean

7   everything is tracked in Quick Books.

8        Q.   Okay.  Thank you.  What was

9   Longbranch's, the Bakery and the Cafe, annual

10  dollar volume of sales for the year 2019?

11       A.   2019, I believe it was somewhere in the

12  area of 800,000, give or take, so.  You have the

13  documentation already, so you can look it up.

14  And I'm drawing from memory, but I think in that

15  ballpark.

16             (Whereupon, RAMSEYER GREENBERG

17              Deposition Exhibit No. 3

18              was marked for identification.)

19  BY MS. NOLTE:

20       Q.   Well, while we are on that subject, if

21  you can please turn to what I have marked as DOL

22  Deposition Exhibit 3.

23       A.   Uh-huh.

24       Q.   Now, this purports to be a statement of
```



1    daily pooled tips?

2        A.    No.

3        Q.    And did the Bakery make and keep

4    timecards showing the daily and weekly hours of

5    each employee, to your knowledge?

6        A.    To my knowledge, the Bakery used

7    physical timecards to help people physically

8    punch in and out on a full-time clock.  Then

9    when those hours were reported for payroll, it's

10   my understanding that the timecards were thrown

11   away and they started a new card.

12       Q.    And who was it, if you know, who kept

13   those timecards before they were inputted into

14   payroll?

15       A.    The bakery manager.

16       Q.    Bakery manager.  And who was it who

17   made the payroll records?

18       A.    The bookkeeper.

19       Q.    And I know we have discussed the

20   timecards, but how long were the payroll records

21   kept for, if you know, or are they kept for?

22       A.    I don't know how long they are kept.

23       Q.    Okay.  Turning to talk more about the

24   employees of the Cafe.  From 2018 through the



1    initially were paid $5.  And I think it bumped

2    up to 5.50 in the period in question.  Now it's

3    up to 6.60 currently.

4        Q.   Did the Cafe take a tip credit for

5    servers to meet its minimum wage obligation?

6        A.   Yes.  STOP

7        Q.   Were servers informed about the Cafe

8    taking a tip credit towards their wages?

9        A.   Informed?  That's a tricky question.

10   It was -- yes, because it was on their paycheck.

11   I mean it had it in writing.  So, yes, it's

12   informed, it's information.

13       Q.   So they were informed through their

14   paycheck which would reflect that?

15       A.   Yes.

16       Q.   Was there any other way that they were

17   -- that servers were advised about the tip

18   credit?

19       A.   Not to my knowledge.  It's not like we

20   had a staff meeting around it.

21       Q.   Okay.  For baristas, what wage did the

22   Cafe pay baristas?

23       A.   The same as servers.

24       Q.   And then did the Cafe also take a tip



Exhibit

1    credit for baristas to meet its minimum wage

2    obligation?

3        A.   Yes.

4        Q.   And would baristas have been informed

5    via their payroll check in the same manner as

6    servers of the tip credit?

7        A.   Yes, it was the same.

8        Q.   Is there any other way in which

9    baristas would have been informed of the tip

10   credit?

11       A.   No.

12       Q.   Okay.  At what wage did the Cafe pay

13   dishwashers?

14       A.   Whatever the current minimum state wage

15   was.  It varied.

16       Q.   Did the Cafe take a tip credit for

17   dishwashers?

18       A.   No.

19       Q.   To your knowledge, did dishwashers

20   receive tips from customers?

21       A.   From customers, no.

22       Q.   And on what days did dishwashers work,

23   if you know?

24       A.   Whatever days we were open.

1     Q.   So was there a dishwasher on every day

2   that you were open?

3     A.   Yes.

4     Q.   Where within the physical facility did

5   the dishwashers perform their work?

6     A.   In the kitchen.

7     Q.   And did diners have access to the

8   kitchen?

9     A.   No.

10     Q.   So turning to cooks, what wage did the

11   Cafe pay cooks?

12     A.   Started at minimum state wage and

13   bumped them up from there.

14     Q.   Did the Cafe take a tip credit for

15   cooks?

16     A.   No.

17     Q.   And, to your knowledge, did cooks ever

18   receive tips from customers?

19     A.   No.

20     Q.   And did cooks also work in the kitchen?

21     A.   Yes.

22     Q.   Did cooks or dishwashers ever work any

23   other jobs?

24     A.   No.

1    Q.   So turning to talk about the tip pool

2    at the Cafe.  I guess to the basis, the Cafe

3    operated a tip pool, is that correct?

4        A.   Correct.

5        Q.   And about how long?  For how long has

6    the Cafe operated a tip pool?

7        A.   The same amount of time that tips have

8    been being given.  We have always had a tip

9    pool.  And we continue, even to this day, to

10   have a tip pool.

11       Q.   Okay.  So during the period of January

12   2018 through the present, did you oversee the

13   tip pool at the Cafe?

14       A.   No, the tip pool was not my personal

15   purview.  That was the purview of the servers

16   and the baristas.  So I did not manage the tip

17   pool, no.

18       Q.   Could you please explain a little bit

19   more to me how the tip pool worked during the

20   period of January 2018 through February 2020,

21   specifically.

22       A.   The tip pool was a long standing

23   practice that arose from conversations with the

24   servers and baristas, those who were receiving



 1   tips, on how to distribute them or whether to

 2   distribute them.

 3          And it was decided by the servers and

 4   baristas right from the beginning that they

 5   would pool and that they would share tips, a

 6   small percentage with the back of the house.

 7   Because, of course, everyone understood that the

 8   back of the house was working hard too, but they

 9   weren't getting any tips.  So they were

10   providing service as well, so.

11          And this was reviewed many times over

12   the years.  It was re-examined.  This question

13   of how to handle tips.  And they chose to

14   distribute the tips in this way, to give a small

15   percentage.

16          As I mentioned, we initially didn't

17   even have a dish washer.  So this created great

18   hardship to servers and baristas not having

19   someone to do their dishes.  So they were very

20   grateful to have a dishwasher when that position

21   was added.

22          So they chose to give the dishwasher a

23   small percentage of what they were getting as a

24   token of good will.  And they also chose to give



1   the cooks a small percentage on a daily basis.

2   Which the cooks would pool in a jar.  And then

3   every couple of weeks or so they would divide

4   it.  Everybody would just get a very small

5   amount of money.

6            But, again, it was a token of goodwill.

7   We're, you know, a mom and pop operation, if you

8   will.  A very small town.  And it was a way that

9   -- I think they thought that it was just being,

10  you know, a nice person and more fair.

11           But it was the decision of the servers

12  and the baristas, one, to pool tips, and two, to

13  distribute it in this way.  I personally did not

14  handle the tips, did not distribute the tips,

15  did not decide how they would do it with their

16  different buckets.

17           And they actually at one point had a

18  very complicated system, coming on and off the

19  clock, and their different buckets that were

20  labeled and named.  And this they developed.

21    Q.   Thank you.  I would like to delve into

22  some different aspects of that a little bit

23  more.  You had mentioned there was sort of a

24  complicated system in place.  Just in terms of



1  logistics, during the period of January 2018

2  through February 2020, how logistically did the

3  tip pool work?  Was there tip buckets?  Did each

4  shift have a bucket?  If you could explain to me

5  a little bit more about that, that would be

6  helpful.

7       A.    There were -- there were tip buckets.

8  And on the honors system they put their cash

9  tips or credit card tips, they would cash them

10  out, their credit card tips, and make them into

11  cash.  All of the money was thrown into the

12  bucket.

13            And then -- so you had an opening

14  server and an opening barista and their bucket.

15  Well, let's say it starts to get busy at 10:00

16  and you bring in a third person.  Now you have

17  two servers and a barista.

18            Well, those two people are still going

19  but now you've added a third person, so now you

20  create a third bucket, okay.  And let's say it's

21  noon and then it's the weekend and then it gets

22  really busy.  So now you bring in, you know, a

23  third server.  Well, now you add a third bucket.

24            Or maybe you bring in -- well, we



1  wouldn't really have four.  We're not that big.

2  But, anyway.  So you keep adding buckets as you

3  add people because the slice of pie keeps

4  getting smaller, right.  And so you could have

5  people who would do the whole shift from

6  beginning to end.  They would be in every

7  bucket.

8         And then some people would be cut

9  early, so now they're not in that last bucket,

10  et cetera.  So that's -- it could get a little

11  complicated.  You could have several buckets out

12  there with -- you know.

13         And, as I said, I stayed out of it.

14  This was how they chose to divide it up.

15     Q.   There's a lot of buckets.

16     A.   A lot of buckets.

17     Q.   Is that how the -- to your knowledge

18  the tip pool operated during the period of

19  January 2018 through February 2020 with the

20  buckets?

21     A.   Yeah.

22     Q.   Okay.  So you mentioned servers and

23  baristas.  Were those the only two positions

24  that paid tips into the tip pool?



1   server carried a bank.  And they would take it

2   out of their bank.  And then we would rectify at

3   the end of the shift when they did their turn

4   in.

5         Q.   Okay.  Thank you.  I apologize for the

6   confusion.

7         A.   I was confused too.  You're fine.

8         Q.   I think we are on the same page now.

9   So when you say their own bank, like where was

10  their -- each servers bank kept?  Was it on

11  their person or was it some place in the back?

12        A.   It was either on their person.  Some of

13  them physically carried it on them.  Or behind

14  the counter where they were working and getting

15  things.  You know, they have a little cubbyhole

16  where each one would have their, you know, money

17  in a folder or a porklinay (phonetic) or

18  something.  And they, you know, keep them

19  separate.

20        Q.   Okay.  Thank you.  So dishwashers

21  received a portion of the pooled tips, is that

22  right?

23        A.   That's right.

24        Q.   And what portion of pooled tips went to



1    dishwashers?

2        A.    Five percent.

3        Q.    And I think you had touched on this a

4    bit previously, but who determined the amount,

5    that five percent amount that dishwashers

6    received?

7        A.    The servers and baristas who were

8    receiving the tips determined that.

9        Q.    At what point in time was that

10   determined?

11       A.    It was a long standing practice.  It

12   was determined -- well, when we -- as I said, we

13   built the business up slowly.  When we added the

14   dishwashers then it was determined, well, we

15   should give them a little something.

16           And then as the kitchen got busier and

17   busier -- you see, we used to not even have

18   food.  And then when we re-did the kitchen and

19   added the food, then the kitchen -- people

20   started coming in and wanting the food.

21           So that's where we bought the second

22   building and started the Bakery.  We didn't even

23   have room to bake anymore.  So that's why we did

24   the offsite thing.  So when the food thing grew



1    it's a fifteen year period.  But it was never

2    changed.

3        Q.   So I want to talk more about those

4    discussions in a minute.  But just to I guess

5    cover the basics before we dive into that, cooks

6    also received tips from the tip pool, correct?

7        A.   Correct.

8        Q.   And was that amount also five percent?

9        A.   Collectively, yes.  Not each.  It

10   wasn't that each cook that got five percent.

11   They pooled as well.

12       Q.   The five percent was divided amongst

13   the cooks who had worked, is that right?

14       A.   Correct.

15       Q.   And then the remainder of the tip pool,

16   was that distributed to servers and baristas?

17       A.   Yes.  Ninety percent was then divided

18   equally among them.

19       Q.   So besides the dishwashers, cooks,

20   servers, and baristas that we have discussed,

21   did anyone else get paid from the tip pool,

22   receive payments from the tip pool?

23       A.   We had a brief time where we had a

24   hostess when it was super busy.  And the hostess



 1   was the change.

 2       Q.   Okay.  Going back to the period

 3   starting in January 2018 and then coming through

 4   the present, how were servers and baristas

 5   informed of the tip pool?

 6       A.   February '18 and going to the present,

 7   that's the timeline you're referencing?

 8       Q.   I'm sorry, January 2018 through the

 9   present.  I apologize.

10       A.   No, that's okay.  January 2018 through

11   the present how were servers and baristas

12   informed of the tip pool?

13       Q.   Yes.

14       A.   Well, a new hire would receive a

15   handbook.  And also when we hired, you know, we

16   essentially talked about it.  We would tell

17   them.  It's in writing and we tell them.  I mean

18   you inform the new hire how things are done

19   here, you know.

20       Q.   So when you say it was in writing

21   you're referring to that handbook?

22       A.   Yeah.

23       Q.   And would this occur then at the time

24   or around the time that the server or barista



1    was hired?

2        A.   Yes.

3        Q.   And who -- when you speak of them being

4    verbally informed that this is how this is done

5    here, who was the one who would be verbally

6    providing that information to the servers or

7    baristas, new servers or baristas?

8        A.   I would provide that information when

9    interview and hiring.  The people they work with

10   would provide that information when they started

11   working with them.  I mean they would pick it up

12   and take it from there.  So it would be

13   explained through really a number of people.

14       Q.   Going back to the handbook quickly.

15   Was the handbook provided to the Department of

16   Labor at any point either during the

17   investigation or after during formal discovery?

18       A.   I don't know.

19       Q.   Is that something that --

20   THE WITNESS:  Did you?

21   MS. RHODE:  If it was requested it was.

22   THE WITNESS:  Yeah.

23   MS. RHODE:  I mean I don't know right

24   offhand.  But if you requested it, it was.



 1    MS. NOLTE:  Okay.  Thank you.  I will go back

 2  and ensure that is the case.  In the event that

 3  it's not, is that something that Longbranch is

 4  willing to provide to the Department of Labor?

 5    MS. RHODE:  Of course.  Yes.

 6    MS. NOLTE:  Thank you.

 7  BY MS. NOLTE:

 8    Q.  So then turning back to the verbal

 9  communication either when the new server or

10  barista was hired or during the interview

11  process, what information was conveyed to

12  servers and baristas about the tip pool?

13    A.  What was conveyed?  Well, we basically

14  explained it.  You know, how it worked.  I have

15  already given you the details, Ms. Nolte.  I

16  mean I can go over it again, but I think it's

17  already part of the record.  I basically just

18  tried to explain, these are the procedures we

19  follow here.

20        And no one ever said like, oh, that

21  doesn't work for me.  Or no one ever said, well,

22  I -- I mean I have worked at places where you

23  have your section and those are your tips and

24  you don't pool with anyone, right.  And you can



Exhibit

 1   give your dishwasher something if you want or

 2   your busboy or whatever.

 3          But it was explained, you know, this is

 4   how we -- these are the practices we follow

 5   here.  And people were making plenty of money.

 6   It seemed to work for everyone.  I mean I never

 7   had a person say I'm not willing to do that or I

 8   would prefer to handle it another way.

 9          I think people just accepted it and

10   jumped right in and got to work.  And happily

11   so.

12       Q.   Okay.  And I certainly don't want to

13   make you repeat information that you have

14   already gone through.  But just to verify the

15   tip pool, so were they told -- were new servers

16   and baristas told that a certain percentage of

17   the tip pool went to dishwashers and cooks?

18       A.   Yes, that was -- the system was laid

19   out.  Our goofy little bucket system was

20   explained.  And also people were informed that

21   five percent went to the dishwasher and five

22   percent went to the cooks.  That was put out

23   there straight up.  If that's your question,

24   yes.



1       Q.   Okay.  Thank you.  So we had talked

2    about discussions between servers and baristas

3    previously regarding the tip pool.  During the

4    period of January 2018 through February 2020,

5    did servers and baristas have any meetings about

6    the tip pool, to your knowledge?

7       A.   Have any what?

8       Q.   Have any meetings about the tip pool,

9    to your knowledge?

10      A.   Have any meetings?  Well, we -- we had

11   occasional staff meetings.  I don't know.

12   That's the short answer.  I don't know if there

13   were any meetings about the tip pool.  As I say,

14   it was a longstanding tradition.  So in that

15   specific time period that you're giving me, I

16   don't know if -- I don't know if there were

17   meetings around that.

18            There were -- there were occasional

19   staff meetings.  And it was occasionally

20   questioned do you want to continue to tip pool

21   and divide tips in this way.  But specifically

22   that time period, I don't know.

23      Q.   So the topic of whether and how --

24   whether to tip pool and how much was raised



1   during staff meetings at some point, is that

2   right?

3        A.   Yes.  It was raised off and on over the

4   years.  As I said, we had been doing this

5   practice approximately fifteen years.  And from

6   time to time it would be questioned do you want

7   to keep doing it this way.  And in fact everyone

8   always said yes because it seemed to work for

9   everyone.

10            No one ever came to me and said -- I

11   was never aware of a staff meeting where people

12   said, no, I'm opposed to this.  Or no one ever

13   came to me personally and said, hey, I need to

14   meet with you, this isn't working for me.

15            Nor was I informed like, hey, there is

16   a DOL reg that says you can't do this.  That

17   would have been nice to know.  So, yeah.

18        Q.   So it sounds like what I'm hearing from

19   you is that that topic was discussed at staff

20   meetings at some point since the tip pool was --

21   or at some point, multiple points, since the tip

22   pool began, but you're not sure whether there

23   was a staff meeting that addressed this topic

24   during that specific period of January 2018



Exhibit

1    through February of 2020, is that right?

2        A.   That's correct.

3        Q.   Okay.  Expanding then the period more

4    broadly.  During the staff meetings in which the

5    tip pool was discussed, did you attend these

6    staff meetings or did you hear about it after?

7        A.   I would attend every staff meeting.

8    So, yeah, I was -- I was at the staff meetings.

9    But the decision -- the tipping -- the tips

10   belonged to the servers and the baristas.  I was

11   not part of that.

12           I never touched the money.  I didn't

13   distribute the money.  And I didn't decide how

14   it was to be handled.  And, as I mentioned, they

15   still tip pool, just we know now not to give a

16   percentage to the cooks and dishwashers.

17           But that is their decision.  If they

18   came to me today and said, you know what, we

19   want to go the old school restaurant style of

20   having stations and every man for himself, then

21   that's what we do.

22       Q.   Aside from servers and baristas and you

23   mentioned you had attended those staff meetings

24   in which the tip pool was discussed, were there



Exhibit 1 — Elaine Ramseyer Greenberg 09/30/2021

1      Q.   To your knowledge, has a server ever

2   decided or a barista ever decided to keep some

3   or all of their cash tips?

4      A.   No.

5      Q.   So you don't know of any instance in

6   which a server or barista decided to keep cash

7   tips?

8      A.   No, I do not.  My knowledge is we have

9   always pooled.

10     Q.   Okay.  How about credit card tips,

11  could servers chose to keep credit card tips if

12  they wanted to?

13     A.   No, we have always -- we pooled.

14     Q.   And then same for baristas?

15     A.   Same.

16     Q.   So then, to your knowledge, has a

17  server ever kept their card tips rather than

18  contribute them to the pool?

19     A.   Not to my knowledge.

20     Q.   And is that the same for baristas?

21     A.   Yes.

22     Q.   During the period of January 2018

23  through February 2020, what would have happened

24  if a server or a barista was found to have

1   pocketed some of their cash or credit card tips?

2       A.   Well, if they had done it

3   surreptitiously without being upfront about it,

4   then we would have had a problem.  And that

5   would have required going to my office and

6   having a little talk because that would be

7   something to work out.

8            Either way it would be something to

9   work out.  If they came forward and just

10  straight up said like, hey, I don't agree with

11  the system, and the way I like to do things is

12  blah-blah-blah, and laid out their alternative

13  position, I would have been happy to entertain

14  that.

15           It probably would have required a staff

16  meeting and saying do other people feel this

17  way.  I mean we are very process oriented and

18  kind of over-communicaters.  And so that would

19  have -- you know, either way that would have

20  been something to talk about.

21           If they had been doing it

22  surreptitiously, that's a much bigger problem

23  than saying like, hey, I don't agree with the

24  system.  But, you know, we would have had to



1   work through it.

2           I'm very loyal to kick people to the

3   curb for infractions.  So it would take a lot to

4   get you fired.  But, you know, we would have had

5   to work it out.

6       Q.   Has that ever happened -- or during the

7   period of January -- I don't want to ask you

8   about a whole, you know, fifteen years.  But

9   during the period of January 2018 through

10  February 2020 did that occur ever?

11      A.   It's never occurred.

12      Q.   It's never occurred.  Okay.  So has a

13  server or barista ever been ordered to tip out a

14  dishwasher or cook?

15      A.   No.  They are never ordered.  They did

16  -- new hires did come into a pre-existing

17  climate where they might maybe have felt

18  ordered.  Or like, you know, if I want to, you

19  know, fit in with this group, this is how things

20  are done.  But they weren't ordered.  But they

21  did understand how we do things here.

22          And maybe if he was a new high, you're

23  kind of like, okay, and you could go along with

24  it.  It's very hard now, because these are super



1      Q.   Does that percentage allocation reflect

2    what percentage allocations of the tip pool were

3    actually in fact being done at the time period

4    -- during the time period of January 2018

5    through February 2020?

6      A.   No, it doesn't.

7      Q.   What's different?

8      A.   It was five percent to the kitchen and

9    five percent to the dishwasher.  The bar back,

10   host, busboy, these are more theoretical

11   notions.  But really the business -- I mentioned

12   earlier we had a hostess for a very brief

13   period.

14        We really didn't -- this just sort of

15   is written more theoretically should we have all

16   of these additional employees.  But basically it

17   was five percent to the dishwasher and five

18   percent to the kitchen.  This does not

19   accurately reflect the day-to-day business.

20     Q.   Okay.  And the reason it does not

21   accurately reflect is because there was not

22   necessarily a host or busboy at the time, is

23   that right?

24     A.   Yes.  Those people weren't active.



1   Those --

2        Q.   Is there any -- oh, I'm sorry.  Please

3   repeat that.  I apologize.

4        A.   Those employees, bar back, host,

5   busboy, they weren't actually on.  We weren't

6   that busy.  I think that's why I'm not sure

7   about the timeframe of this.  As I said, we did

8   nothing but grow for many years.

9             I think this was kind of on the off

10  chance that we keep growing and I keep adding

11  staff.  But in realty, we didn't have those

12  staff yet.  Maybe it was just -- the thinking

13  was should we have them, be prepared to offer

14  them something as well.  But it didn't actually

15  go that direction.

16       Q.   Aside from that issue that we just

17  discussed, is there any other aspects of this

18  policy that did not accurately reflect the

19  operations of the tip pool in actuality during

20  the period of January 2018 through

21  February 2020?

22       A.   That seems like a good representation.

23       Q.   And despite the fact that this document

24  discusses a host, a busboy, positions that had



1      Q.   So turning away from that.  That's all

2    I really wanted to discuss with regard to the

3    alleged overtime violation.  I want to talk

4    about efforts that the Cafe may have undertaken

5    to -- to ascertain information about the Fair

6    Labor Standards Act, which I might call the Act,

7    I might call the FLSA.  So during the period of

8    January 2018 through February 2020 what did you

9    personally know about the Fair Labor Standards

10   Act?

11     A.   Nothing.

12     Q.   And would your answer be the same as a

13   representative of -- a corporate representative

14   of Longbranch?

15     A.   I would not be apprised -- I did -- I

16   was not reading about the FLSA, whatever the

17   initials are.  I didn't.  So I was not informed

18   about that.  I didn't spend my time researching

19   it.  I mean I was absorbed in the day-to-day

20   operations of the business, honestly.  I -- so

21   when I say nothing, I'm being pretty literal.

22     Q.   Okay.  Did you believe that the Cafe's

23   tip pool complied with the Fair Labor Standards

24   Act during the period of January 2018 through



1   worth mentioning is that bookkeepers, CPA's,

2   whatever, it was -- it was never -- or even

3   employees, it was never pointed out that there

4   was a violation of a reg.  So I was not made

5   aware.

6   BY MS. NOLTE:

7       Q.   I think you touched on this, but did

8   you look over any wage hour guidance materials

9   in determining compliance with the Fair Labor

10  Standards Act specifically?

11      A.   What was the last part of your

12  sentence, Ms. Nolte?

13      Q.   With regards to the Fair Labor

14  Standards Act, in determining compliance with

15  that?

16      A.   Would you repeat your question please.

17      Q.   Of course.  Thank you.  Did you ever

18  look over any wage hour guidance materials in

19  determining whether the tip pool complied with

20  the Fair Labor Standards Act?

21      A.   No.

22      Q.   What about in determining whether the

23  Cafe's overtime policies complied with the Fair

24  Labor Standards Act?

```
 1        A.   No.  I relied on my bookkeeper to
 2   compute the payroll.  And we -- we -- and she
 3   thought that we were doing it correctly.  And in
 4   fact when Lindsey Corona sat down with her and
 5   explained the formula, we didn't know.  So we
 6   thought we were in complete compliance.
 7        Q.   So is it fair to say that you relied on
 8   your bookkeeper with regards to the overtime --
 9   or compliance with the overtime requirements?
10        A.   Yes.
11        Q.   Okay.  Did you ever specifically
12   discuss with your bookkeeper the overtime
13   requirements of the Act?
14        A.   No.
15        Q.   And, to be specific, when we're
16   discussing your bookkeeper, would your -- would
17   you have relied on your bookkeeper with regard
18   to the tip pool or was that specific to the
19   overtime requirements?
20        A.   That's specific to the overtime
21   requirements.  I don't -- I don't think she had
22   any involvement with the tip pool or any
23   understanding of it whatsoever.  That's kind of
24   behind the scenes in terms of different areas.
```



1      Q.   Okay.  Thank you.

2      A.   She had nothing -- I guess she had

3   nothing to do with the tip pool.

4      Q.   Okay.  Sounds good.  In determining

5   compliance with the Fair Labor Standards Act,

6   with regards to the tip pool or with regards to

7   the overtime requirements, did you ever like

8   look at wage hours websites?

9      A.   No.

10      Q.   Prior to the investigation did you ever

11   consult with any government officials, state,

12   local, federal, about the requirements of the

13   Fair Labor Standards Act?

14      A.   No.

15      Q.   And without revealing any privileged

16   information, did you ever consult with a lawyer

17   about compliance with the Fair Labor Standards

18   Act?

19      A.   No.

20      Q.   Is there like anybody else that you may

21   have consulted with, discussed, during the

22   period of January 2018 through the present in

23   compliance with the Fair Labor Standards Act?

24      A.   No.



1          IN THE UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF ILLINOIS

3   MARTIN J. WALSH,          )
    Secretary of Labor,       )
4   United States Department  )
    of Labor,                 )
5              Plaintiff,     )
      vs.                     ) No. 2021 CV 56
6   DAYEMI ORGANIZATION,      )
    INC., d/b/a LONGBRANCH    )
7   CAFE AND BAKERY, an       )
    Illinois Corporation,     )
8   and ELAINE RAMSEYER       )
    GREENBERG, an             )
9   individual,               )
               Defendants.    )

10

11          I, ELAINE RAMSEYER GREENBERG, being
    first duly sworn, on oath say that I am the
12  deponent in the aforesaid deposition taken on
    the 30th day of September, 2021; that I have
13  read the foregoing transcript of my deposition,
    and affix my signature to same.

14

15          _____
                ELAINE RAMSEYER GREENBERG

16

17      Subscribed and sworn to
        Before me this_____ day
18      Of_____, 2021.

19      _____
            Notary Public

20

21

22

23

24



1  STATE OF ILLINOIS      )

2                                         ) SS.

3  COUNTY OF C O O K      )

4

5          I, Trisha A. Rankin, Certified Shorthand

6  Reporter for the State of Illinois, do hereby

7  certify that heretofore, to-wit,

8  ELAINE RAMSEYER GREENBERG, personally appeared

9  before me via videoconference, in a cause now

10  pending and undetermined in the United States

11  District Court, Southern District of Illinois,

12  wherein MARTIN J. WALSH, et al., is the

13  Plaintiff and DAYEMI ORGANIZATION, INC., et al.,

14  are the Defendants.

15          I further certify that the said

16  ELAINE RAMSEYER GREENBERG, was first duly sworn

17  to testify the truth, the whole truth and

18  nothing but the truth in the cause aforesaid;

19  that the testimony then given by said witness

20  was reported stenographically by me in the

21  presence of the said witness, and afterwards

22  reduced to typewriting by Computer-Aided

23  Transcription, and the foregoing is a true and

24  correct transcript of the testimony so given by

Exhibit Elaine Ramseyer Greenberg 09/30/2021

1    said witness as aforesaid.

2         I further certify that the signature to

3    the foregoing deposition was reserved by counsel

4    for the respective parties.

5         I further certify that the taking of this

6    deposition was pursuant to notice and that there

7    were present at the deposition the attorneys

8    hereinbefore mentioned.

9         I further certify that I am not counsel

10   for, nor in any way related to the parties to

11   this suit, nor am I in any way interested in the

12   outcome thereof.

13        IN TESTIMONY WHEREOF:  I have hereunto

14   set my verified digital signature, this 22nd day

15   of October 2021.

16

17

18

19   _____

20   TRISHA RANKIN
     CSR LIC. NO.  084.004833

21

22

23

24

1          McCorkle Litigation Services, Inc.
            200 North LaSalle Street, Suite 770
2                  Chicago, Illinois 60601-1014
    CERTIFIED MAIL
3
    October 22nd, 2021
4
    Ms. Elaine Ramseyer Greenberg
5   100 East Jackson Street
    Carbondale, Illinois 62901
6
    IN RE:  MARTIN J. WALSH VS. DAYEMI
7           ORGANIZATION, INC.
    DATE OF DEPOSITION:  September 30th, 2021
8
    Dear Ms. Ramseyer Greenberg:
9
    Your deposition taken in the above-entitled
10  cause is now ready for reading and signing as
    required by law.
11
    Please Call the Signature Department upon
12  receipt of this letter to schedule an
    appointment to come to the above address to read
13  and sign your deposition.  You have 28 days from
    the date of this correspondence in which to
14  appear for reading and signing.

15  If you fail to appear or to notify us so that we
    may make arrangements for another appointment,
16  your deposition will be completed and forwarded
    to the attorneys and will be "... used as fully
17  as though signed."

18      _____ Procedure outlined in Rule 207 (a) of
                 the Illinois Supreme Court Rules
19
        _____ Procedure outlined in Rule 30 (e) of
20               the Rules of Civil Procedure for the
                 U.S. District Courts
21

22  Sincerely,
    Cindy Alicea              Court Reporter Present:
23  Signature Department      Trisha Rankin
    (312) 263-0052
24

