## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| MARTIN J. WALSH, Secretary of Labor, United States Department of Labor[1], <br><br> Plaintiff, <br><br> vs. <br><br> DAYEMI ORGANIZATION, INC. d/b/a LONGBRANCH CAFÉ AND BAKERY, an Illinois Corporation, and ELAINE RAMSEYER GREENBERG, an Individual, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 21-cv-56-SMY |

## MEMORANDUM AND ORDER

**YANDLE, District Judge:**

Plaintiff Martin J. Walsh, Secretary of Labor, U.S. Department of Labor (the "Secretary") filed suit on behalf of 32 current and former employees against Defendants Dayemi Organization, Inc. d/b/a Longbranch Café and Bakery and Elaine Ramseyer Greenberg, alleging violations of the Fair Labor Standards Act, as amended 29 U.S.C. § 201 *et seq* ("FLSA"). The Secretary seeks back wages, liquidated damages, and injunctive relief.

The case is now before the Court for consideration of the Secretary's Motion for Summary Judgment (Doc. 23), which Defendants oppose (Doc. 29). For the following reasons, the motion is **GRANTED in part** and **DENIED in part**.

### Factual Background

Construed in the light most favorable to the non-moving party, the evidence and reasonable inferences establish the following facts relevant to the pending motion: Defendant Dayemi

---

[1] By operation of law, Secretary of Labor Martin J. Walsh is substituted for former Secretary of Labor Eugene Scalia. *See* Fed.R.Civ.P. 25(d).

Organization, Inc., d/b/a Longbranch Café and Bakery ("Longbranch"), is a corporation operating in Carbondale within Jackson County, Illinois (Doc. 16, ¶ II.A). Longbranch is owned by Dayemi Organization, Inc., which is owned by Baraka Trust (Doc. 24-1, at ¶¶ 8c, 9). Defendant Elaine Ramseyer Greenberg ("Greenberg") is an officer of Dayemi Organization and a board member of Baraka Trust. *Id.* ¶ 9.

Longbranch is composed of a full-service café/restaurant located at 100 E. Jackson St. (the "Café"), and an off-site bakery located 0.1 miles away from the Café at 218 N. Illinois St. (the "Bakery"). *Id.* The Café serves baked goods, coffee, and vegetarian/vegan fare and employs servers, baristas, cooks, and dishwashers, among others. *Id.* ¶ 4. The Bakery prepares baked goods for the Café and offers catering for weddings. *Id.* ¶ 5. Longbranch's gross annual dollar volume of sales for calendar years 2018 and 2019 were $809,303 and $766,884 respectively (Doc. 23-1, ¶8d; Doc. 19). It had an annual gross volume of sales approximately $211,000 in 2020 (Doc. 29-1, at p. 25).

Defendant Greenberg is the general manager of the Café and has held this position for approximately 18 years (Doc. 24-6, at p. 16). She is responsible for overseeing the general day-to-day operations of the Café, including supervising employees, and hiring and firing employees. *Id*. She also oversees operations of the Bakery, procures supplies, hires employees, and provides guidance regarding employee discipline. *Id.* at pp. 16-19.

**Investigation**

Lindsey Corona, an employee of the U.S. Department of Labor, Wage, and Hour Division, was assigned to investigate Longbranch in February 2020 (Doc. 23-1, ¶ 4). The initial investigation was opened on February 3, 2020 and covered the Café and Bakery for the period of February 6, 2018 through February 5, 2020 ("the investigation period"). *Id*. During the course of

the investigation, Corona conducted an unannounced visit to the Café, interviewed nine current and former employees, and reviewed Longbranch's pay records (Doc. 23-1).

Greenberg testified that she knew nothing about the FLSA prior to the initiation of the investigation (Doc. 24-11, at p. 91). Longbranch did not review the Wage & Hour Division's guidance or website, or consult with any lawyer, financial advisor, or government official about whether their pay practices complied with the FLSA. *Id.* at pp. 94-96.

### Compensation Practices

Longbranch paid servers and baristas either $5 or $5.50 per hour and took a tip credit for the remainder of their minimum wage obligation (Doc. 19). Greenberg testified that servers and baristas were only notified of the tip credit when they saw it on their paychecks (Doc. 24-6, p. 41). There was no other notification to employees regarding the tip credit to her knowledge. *Id*. Longbranch computed the overtime premium rate for servers and baristas who worked more than 40 hours per workweek based on their hourly cash wage rate of $5 or $5.50 (Doc. 19).

Longbranch employed Wilbur Davis as the barista manager at the Café (Doc. 19). Davis was paid a salary of $471.15 per workweek during the entire investigation period. *Id.* He worked more than 40 hours during several workweeks from January 1, 2020 to February 5, 2020 (Doc. 23-3).

Longbranch paid the Café's cooks and dishwashers at the hourly state minimum wage or higher during the investigation period and did not take a tip credit for them (Doc. 24-6, pp. 42-43). Dishwashers and cooks performed their work in the kitchen, which diners could not access, and did not receive tips from customers. *Id.* at pp. 42-43. Cooks and dishwashers did not hold any other positions at the Café. *Id.*

Longbranch had a longstanding tip pool in which servers and baristas placed all tips received during a shift into a tip jar (Doc. 24-6, pp. 46-48). Money from the tip jar was distributed at the end of each shift to employees who worked that shift: 90% divided between the servers and baristas, 5% to the cook(s), and 5% to the dishwasher. *Id.* at pp. 51-54. The tip policy was included in the Front of the House Standard Operating Procedures ("FOH SOP") (Doc. 24-2). The "Tip Out Policy" states:

> "Over the years, we have found that pooling tips is the fairest approach. It creates a spirit of teamwork and builds trust. The procedure we follow to tip out Servers, Baristas, Kitchen Staff, Dishwashers, Barbacks, Hosts, and Busboys has always been based on the honor system."

(Doc. 24-2). The Policy explains how the tip pool operates, including instructions for how servers should pay cash and credit card tips into the tip jars and how the money from the tip pool should be distributed. *Id.*

Greenberg and other employees informed interviewees and newly hired servers and baristas about the tip pool, including how it operated and amounts paid to cooks and dishwashers from the tip pool (Doc. 24-6, pp. 58-61). Greenberg testified that new hires were told that the tip pool was part of "the practices we follow here" at the Café and no one ever said they were not willing to do it. *Id.* at pp. 60-61. She did not recall if the servers and baristas had any meetings about the tip pool in 2018 or 2019; "it was a longstanding tradition." *Id*. at p. 62. In the past, the servers and baristas met from time to time and chose to continue the sharing of tips practice that they had endorsed for many years; "everyone always said yes." *Id.* at p. 63. The decision to pool tips belonged to the servers and baristas. *Id*. at p. 64; Doc. 29-1, p. 70. The servers and baristas could change the system or choose not to participate in the tip pool. *Id*. at p. 70. Servers and baristas could absolutely choose to keep their cash tips if they wanted to. *Id.*

Some employees understood the tip pool to be mandatory (Doc. 33-1, at ¶ 9; Doc. 33-4, at ¶ 15; Doc. 33-5, ¶ 9). These employees averred that they had no control over whether to pay into the tip pool, what amount to contribute, or how the tip pool was distributed. *Id.* The servers and baristas were unhappy about sharing their tips and complained about the practice amongst themselves (Doc. 33-1, ¶¶ 10-11; Doc. 33-4 ¶ 10; Doc. 33-5, ¶ 12). Servers and baristas who deviated from the tip pool rules, inadvertently or otherwise, were made to comply (Doc. 33-1 at ¶ 11; Doc. 33-4, at ¶¶ 12-13; Doc. 33-5, at ¶ 11.)

Other employees averred that the tip pool was a decision made only by the servers and baristas; that servers and baristas decided to continue the on-going voluntary practice of sharing tips with the cooks and dishwashers; and that they never disagreed with tip sharing (Doc. 29-2, at ¶ 14-19; Doc. 29-3, at ¶ 14-19; Doc. 29-4, at ¶ 14-19; Doc. 29-5, at ¶ 14-19; Doc. 29-6, at ¶ 14-19).

### Recordkeeping Practices

The Café's pay records for the investigation period show that Longbranch paid servers and baristas a regular hourly cash wage of $5 or $5.50 and overtime at one-and-one-half times their hourly cash wage. *Id.* at ¶ 15c; Doc. 23-3; Doc. 23-4). Longbranch did not document the amount of tips received by Café employees (Doc. 19). At the Bakery, Longbranch used timecards to record the hours worked each day and week by Bakery employees but threw away the timecards after they were used to input the biweekly payroll into Quickbooks (Doc. 23-1, at ¶ 16; Doc. 24-11 at p. 29).

### Discussion

Summary judgment is proper if the moving party can demonstrate that there is no genuine issue as to any material fact – that is where the non-moving party "has failed to make a sufficient

showing on an essential element of her case with respect to which she has the burden of proof." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-323 (1986). If the evidence is merely colorable or is not sufficiently probative, summary judgment should be granted. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986). Any doubt as to the existence of a genuine issue of material fact must be resolved against the moving party. *Lawrence v. Kenosha County,* 391 F.3d 837, 841 (7th Cir. 2004).

The Secretary moves for summary judgment, arguing that Longbranch improperly took a tip credit for tipped employees in violation of FLSA's minimum wage provisions, paid tipped employees less than one-and-one-half times their regular rates for overtime work, misclassified a manager as FLSA exempt in violation of the Act's overtime requirements, and failed to make and keep appropriate pay and time records.

### *Covered Employer*

FLSA imposes duties on employers with respect to compensation of employees engaged in commerce or employed by an enterprise engaged in commerce.[2] As a threshold element to his claims, the Secretary must establish that the defendants were covered by FLSA as an enterprise engaged in commerce. An "enterprise engaged in commerce or in the production of goods for commerce" means an enterprise that: (i) has employees engaged in commerce or in the production of goods for commerce, or that has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person; and (ii) is an enterprise whose annual gross volume ("AGV") of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated). 29 U.S.C. § 203(s)(1)(A)(i) and (ii).

---

[2] Defendants concede that Longbranch and Greenberg were employers for FLSA purposes.

Longbranch concedes that it was covered by FLSA in 2018 and 2019 but contends that it did not exceed the statutory amount in 2020 because its AGV totaled only $211,000 that year. The Secretary argues that pursuant to the "rolling quarters" method set forth in 29 C.F.R.§ 779.266(b), the Court must look to Longbranch's AGV for 2019 to determine whether it was covered by FLSA in 2020.

"Under the express language of § 779.266(a), the "rolling quarters" method is a regulatory tool to determine whether a defendant employer, who once met the gross sales requirement in the previous year, continues to be subject to enterprise coverage in the following year." *Donovan v. I–20 Motels, Inc.,* 664 F.2d 957, 958 (5th Cir.1981). "If an employer's business exceeds the dollar volume requirement in any calendar year, the business will be presumed to be covered in the next year unless the employer establishes through use of the rolling quarter method that its dollar volume for the previous twelve months has fallen below the [$500,000] mark." *Id.* (citing 29 C.F.R. § 779.266).

There is no dispute that Longbranch met the AGV requirement in 2019 – gross sales for 2019 totaled almost $800,000. The 12-month period immediately preceding the first quarter of 2020 consists of all four quarters of calendar year 2019. Thus, for the alleged violations occurring in the first quarter of 2020, Defendants were covered by FLSA, regardless of their AGV for 2020. Accordingly, the Court concludes as a matter of law that Defendants were covered by FLSA during the investigation period and subject to FLSA's minimum wage, overtime, and recordkeeping obligations.

### *Minimum Wage Violation*

FLSA requires employers pay a federal minimum wage of at least $7.25 per hour. 29 U.S.C. § 206(a). For tipped employees, an employer may satisfy the federal minimum wage

requirement by paying a lower minimum wage rate and adding the amount of tips earned by the employee to total the requisite $7.25 per hour.  *See* 29 U.S.C. § 203(m)(2).  This practice is known as taking a "tip credit."

Section 203(m) of FLSA obligates employers who take a tip credit to (1) give notice to its employees, and (2) allow its employees to retain all the tips they receive, unless such employees participate in a valid tip pool.  *Id.*  A tip pool is valid if it is comprised exclusively of employees who are "customarily and regularly" tipped and the employer does not "retain any of the employee's tips for any other purpose."  29 C.F.R. § 531.54; *Williams-Green v. J. Alexander's Restaurants, Inc.*, 277 F.R.D. 374, 380-81 (N.D. Ill. 2011).  A portion of an employee's tips are redistributed to other employees who perform customer service functions, such as bussers, bartenders and food runners.  *Id.*  If the tip pool is invalid – either because it includes employees who do not "customarily and regularly receive tips," or because the employer retains a portion of the tips for some other purpose – the employer may not take the tip credit and must pay minimum wage instead.  29 U.S.C. § 203(m); *Williams-Green*, 277 F.R.D. at 379.

Because § 203(m) limits participation in mandatory tip pools to employees who "customarily and regularly receive tips", a valid tip pool generally does not include employees who do not customarily and regularly receive tips, such as dishwashers, cooks, chefs, and janitors.  *See Berger v. Perry's Steakhouse of Ill., LLC*, 430 F. Supp. 3d 397, 404 (N.D. Ill. 2019); *Cumbie v. Woody Woo, Inc.*, 596 F.3d 577 (9th Cir. 2010).  However, a tipped employee may voluntarily choose to share tips with an otherwise ineligible employee, so long as that tip-sharing is done without coercion by the employer.  *See* Dep't of Labor Field Operations Handbook § 30d04(g), Dep't of Labor (Nov. 17, 2016), https://www.dol.gov/agencies/whd/field-operations-handbook/Chapter-30#B30d04 ("DOL Handbook") ("it does not appear that Congress, even in

requiring as a general principle that tipped employees retain all their tips, intended to prevent tipped employees from deciding, free from any coercion what[so]ever and outside of any formalized arrangement or as a condition of employment, what to do with their tips, including sharing them with whichever co-workers they please."); *Roussell v. Brinker Int'l, Inc.,* 441 F. App'x 222, 230 (5th Cir. 2011).  Here, it is undisputed that Longbranch cooks and dishwashers were ineligible to be included in a mandatory tip pool – they had minimal contact with customers, never received tips from customers, and performed all work in the kitchen away from customers. Thus, the critical issue is whether the Longbranch tip pool was mandatory or voluntary.

A genuine factual dispute exists as to whether Longbranch baristas and servers participated in the tip pool voluntarily or if such participation was mandatory.  The Secretary provided declarations from multiple servers and baristas averring that they believed the tip pool was mandatory; that they had no control over whether to pay into the tip pool, what amount to contribute or how the pool was distributed; and that servers who refused were chastised, disciplined or retaliated against.

In sharp contrast to those assertions, Greensberg testified that the servers and baristas had the absolute authority to change the tip pool system if they wanted and could choose not to participate in the pool.  The record also includes sworn declarations of five current and former employees averring that they voluntarily chose to contribute to the tip pool; that they never disagreed with tip sharing; and that they chose to continue the tip pool.  On this record, the issue of whether participation in the tip pool was voluntary or mandatory is a question of fact for the jury to determine.  Accordingly, the Secretary's motion for summary judgment on the minimum wage violation is denied.

*Overtime Violation*

FLSA sets the minimum wage for covered employees at $7.25 per hour. 29 U.S.C. § 206(a)(1)(B). It also requires employers to pay overtime for any hours worked above 40 hours per week. Overtime hours must be paid at least at the rate of 1 ½ times the employee's regular rate. § 207(a). And an employee's regular rate for the purpose of computing overtime pay must be at least equal to the $7.25 minimum wage under the Act. 29 C.F.R. § 778.107. In Illinois, where the legal minimum wage exceeds $7.25 per hour, FLSA mandates that the regular rate cannot be lower than the state minimum wage, as "regular rate" as used in the Act is "construed to mean the regular rate at which he is lawfully employed." 29 C.F.R. § 778.5.

The Secretary contends that Longbranch servers and baristas were not properly compensated for overtime. While Longbranch concedes that it utilized the wrong base salary – $5.00 instead of the federal minimum wage – it notes that when Corona pointed out its error during the investigation, it immediately corrected its practices. But a post-investigation correction does not shield Longbranch from potential liability. Given Longbranch's admission that it failed to pay servers and baristas at the requisite overtime rate, summary judgment will be granted on this claim as to servers and baristas.

Next, the Secretary asserts that Longbranch violated FLSA's overtime provisions by failing to pay barista manager Wilbur Davis at 1 ½ times his regular rate for hours worked over 40 per workweek because they improperly classified him as FLSA exempt and owes him $38.42 for unpaid overtime compensation resulting from the misclassification.

Section 13 exempts from overtime requirements "any employee employed in a bona fide executive capacity. 29 U.S.C. § 213(a)(1). To qualify, and employee must be paid above a certain salary threshold which, as of January 1, 2020, is $684.00 per workweek. 29 C.F.R. §§ 541.100(a),

541.600(a). The evidence establishes that Davis was paid only $471.15 per workweek and that he worked more than 40 hours per week during several weeks of 2020. Longbranch argues, however, that Davis was converted to an hourly employee and fully compensated prior to the Secretary filing this lawsuit. The record supports that Longbranch compensated Davis $49.09 for the unpaid overtime (Doc. 29-7). Because Davis has been fully compensated for his overtime work during the investigation period, summary judgment as to this claim will be denied as moot.

### *Recordkeeping Violation*

FLSA requires that every covered employer "shall make, keep, and preserve...records of the persons employed" and of "the wages, hours, and other conditions and practices of employment maintained" by the employer, and "shall preserve such records for such periods of time" required by regulation. 29 U.S.C. § 211(c). Records must include, among other items, an employee's regular hourly rate; hours worked each workday and each workweek; the total daily or weekly straight-time earnings or wages due; and the total premium pay. 29 C.F.R. § 516.2(a)(6)-(9). For tipped employees, employers are also required to keep and maintain records of the weekly or monthly amount of tips employees receive and report to the employer and the amount by which wages were increased by tips. 29 C.F.R. § 516.28. Payroll records must be maintained for three years and time records, including timecards, must be retained for two years. 29 C.F.R. §§ 516.5, 516.6.

Even viewed in the light most favorable to Longbranch, there is no genuine dispute of material fact that Longbranch failed to keep and maintain accurate records regarding employee compensation and failed to retain records concerning employee hours for the requisite time period. Longbranch did not make or keep records for the Café reflecting the amount of tips each employee

earned. The Café pay records also establish that Longbranch did not make and keep records showing the accurate regular rate and overtime rate for servers and baristas.

At the Bakery, although Longbranch used timecards to record the hours worked each day and week by Bakery employees, the timecards were thrown away after two weeks once payroll was inputted. As a result of these practices, Longbranch violated FLSA by failing to retain Bakery timecards for the requisite two years. Accordingly, the Secretary is entitled to summary judgment on the recordkeeping claim.

### *Liquidated Damages*

An employer who is liable for unpaid overtime is also liable under FLSA for an additional equal amount as liquidated damages. *See* 29 U.S.C. § 216(b); *Uphoff v. Elegant Bath, Ltd.*, 176 F.3d 399, 405 (7th Cir. 1999). Liquidated damages are "mandatory [for FLSA violations] unless the court finds that the employer was acting in good faith and reasonably believed that its conduct was consistent with the law." *Shea v. Galaxie Lumber & Constr. Co., Ltd.*, 152 F.3d 729, 733 (7th Cir. 1998). To establish good faith and reasonableness, an employer must demonstrate that it took affirmative steps to ascertain FLSA requirements; showing that the violations were not willful is not enough. *See Pautlitz v. City of Naperville*, 874 F.Supp. 833, 835 (N.D. Ill. 1994) (citing *Martin v. Cooper Elec. Supply Co.*, 940 F.2d 896, 908–09 (3d Cir. 1991)). The burden of proving both good faith and reasonable belief falls on the employer. *Uphoff*, 176 F.3d at 405.

Defendants argue that liquidated damages are unwarranted because they consulted a licensed C.P.A. and bookkeeper to ensure proper compliance with all pay requirements and their "unintentional mistakes do not undue their good faith." The evidence belies this assertion. Greenberg testified that she knew nothing about FLSA prior to the initiation of the investigation. She also testified that Longbranch did not review the Wage & Hour Division's guidance or

website, or consult with any lawyer, financial advisor, or government official about whether their pay practices complied with FLSA. Employers are obligated to make themselves aware of state and federal law and to make their practices and policies compliant – mistakes in compliance do not establish good faith. *See Walton v. United Consumers Club*, 786 F.2d 303, 312 (7th Cir. 1986) (a "good heart but empty head" does not show a reasonably good faith belief that one's acts or omissions did not violate the FLSA);*Urnikis-Negro v. Am. Fam. Prop. Servs.*, 616 F.3d 665, 672 (7th Cir. 2010) (liquidated damages are presumptively appropriate for FLSA violations). Accordingly, the Secretary's request for liquidated damages is granted as to the overtime claim.[3]

### *Injunctive Relief*

The Secretary seeks an injunction to ensure Longbranch's compliance with FLSA in the future. Courts have "jurisdiction, for cause shown, to restrain violations of" the FLSA's minimum wage and overtime provisions. 29 U.S.C. § 217. An injunction is necessary if there are insufficient assurances of an employer's future compliance. *See, e.g.*, *Brock v. Lauritzen*, 835 F.2d 1529 (7th Cir. 1987).

Longbranch asserts that the tip pooling practice was changed over a year ago following the investigation. The current tip pool only includes servers and baristas. Longbranch further maintains that it has changed its overtime practice to use the full applicable minimum wage paid to servers and baristas to calculate overtime. Given these corrective measures, the Court finds an injunction is unnecessary at this time. Accordingly, the Secretary's motion is denied as to this point.

---

[3] Having found an issue of fact as to whether the tip pool was voluntary, the Court reserves ruling on the issue of liquidated damages as to the alleged minimum wage violation.

## Conclusion

For the foregoing reasons, the Secretary's Motion for Summary Judgment (Doc. 23) is **GRANTED in part** and **DENIED in part.** The Court finds as a matter of law that Defendants violated the FLSA's overtime and recordkeeping requirements. This matter will proceed to trial on the minimum wage claim. The Clerk of Court is **DIRECTED** to enter judgment as to the remaining claims at the close of this case.

**IT IS SO ORDERED.**

DATED:  June 24, 2022

 

**STACI M. YANDLE**
**United States District Judge**